No. 101,613

STATE OF KANSAS, *Appellee*, v. KATREAL M. HARRIS, *Appellant*.

(269 P.3d 820)

Opinion filed February 3, 2012.

*Christina M. Waugh*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Sheryl L. Lidtke*, deputy district attorney, argued the cause, and *Jerome A. Gorman*, district attorney, and *Steve Six*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

BILES, J.: Katreal Harris directly appeals his convictions of first-degree murder, attempted second-degree murder, and criminal possession of a firearm. He claims the district court erred by: (1) failing to instruct the jury on the lesser included offenses of voluntary manslaughter and attempted voluntary manslaughter based on a theory of imperfect self-defense; (2) denying his motion to suppress statements made to police; (3) admitting the victim's pretrial identification of him; (4) denying his motion for mistrial during jury selection; (5) imposing a hard 50 sentence without first submitting the aggravating factors to a jury for proof beyond a reasonable doubt; and (6) including his prior juvenile adjudication in his criminal history without a jury determination. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Blake Overton and Christopher Sloan were shot at close range

in a car at an apartment complex parking lot while attempting to buy cocaine. Sloan died at the scene. Overton was hospitalized with life-threatening injuries, but survived. Overton's injuries prevented him from being interviewed by police for more than a week.

Police initially investigated by interviewing residents at the apartment complex. After a few days, a community police officer received a phone call that the shooter was at the complex. Officers responded and found a disturbance outside an apartment building involving a number of people discussing the shootings. As an officer approached the crowd, he noticed Harris walking from around the side of the building and appearing nervous. Harris was identified by a person at the complex as a man possibly involved in the shootings. Officers arrested Harris after learning he had an outstanding warrant for an unrelated offense. They took him to the police station for questioning. Upon their arrival, officers placed Harris in a locked interview room. Harris claims he was handcuffed or shackled while in the room.

Harris was not immediately interviewed at the station because officers were questioning a woman from the apartment complex who claimed to have information about the shootings of Overton and Sloan. Officers left Harris alone for about 3½ hours, checking on him from time to time, escorting him to the restroom if needed, and providing him with water and a blanket after he complained he was cold.

When his questioning began, the initial portion of Harris' interview was not recorded. We will describe the testimony regarding that in greater detail when relevant to one of the claimed errors on appeal. But once the recording began, Harris was advised of his *Miranda* rights, asked if he understood them, and acknowledged that he had been read those same rights at the beginning of the interview. Harris confirmed he had been treated fairly up to that point and was not under the influence of alcohol or narcotics.

Harris then told detectives he was the shooter. He explained that a black BMW pulled into the complex, and the two men inside told him to come to them. He said that once he approached the vehicle, the occupants asked for someone named Trey. Harris responded that he did not know anyone by that name, so he went

and got Henry "Deon" Sullivan. Harris and Sullivan then returned to the BMW, where Sullivan and the driver soon exchanged angry words during an altercation. Harris recalled the driver saying, "You not Trey," and Sullivan responding, "Fuck Trey." Harris said at that point he saw the driver's hands go down between the seat consoles, so he reached into the car with a gun and fired twice into the driver's neck. Harris said he paused, thinking "Oh my God, I just killed somebody," and fired again at the passenger's head because the passenger said "what the fuck," and Harris "didn't know what else to do." Harris said he used Sullivan's .40 caliber Smith & Wesson handgun to shoot the men, which Harris said he had gotten from Sullivan earlier in the evening. .

A few minutes later, the detective again asked Harris whether he fired the shots, and Harris responded affirmatively, adding that he believed he saw the driver reaching for a gun. The detective asked whether Harris ever saw the gun he thought the driver was reaching for. Harris said he saw only a handle but not the entire gun, and that he thought the gun was black with a clip. Harris also said that prior to seeing the driver reach for what Harris thought was a gun, the driver had scratched Sullivan on the arm during a scuffle after what Harris believed was Sullivan's attempt to reach in and take the gun away. Harris described the events as a "domino effect" because they happened quickly.

About 9 days after the shootings, Overton was interviewed at the hospital. He told detectives that he and Sloan had driven to an apartment complex parking lot to buy cocaine from a man Sloan had referred to as "T" or Trey. Overton drove his family's black BMW. Upon arriving, Overton said they asked a person standing outside for Trey. That person offered to sell them drugs, but Overton declined because he and Sloan were waiting for Trey. The person left, but then returned with another person. Overton described the two men who approached the vehicle, but did not know either of them before the shooting.

To see if Overton could identify the men involved with the shootings, detectives provided him with two displays containing six photographs each. Overton was shown the first, which placed Harris' photo in the first position next to five others the detectives later

described as being similar in appearance to Harris. Overton said he recognized Harris. A second display with Sullivan's photograph in the first position, along with five others, also was shown to Overton. Overton indicated he was drawn to Sullivan's picture, but could not positively identify anyone from that document.

Harris was subsequently charged with first-degree murder, attempted first-degree murder with an alternative charge of aggravated battery, and criminal possession of a firearm. Sullivan was arrested a few days later.

At trial, Harris took the witness stand in his own defense and recanted his recorded statements to police. He testified he drank alcohol, smoked marijuana, and did a "couple lines" of coke the day he was arrested, but acknowledged he told police during his interview that he had not taken drugs that day. Harris also testified that he changed his story during the police interview because he was tired of sitting there and being told the detectives did not believe him, and that he was afraid of a man named "G" or "George," and what "G" would do to him if he told the truth about the shootings. Harris said he lied during the interview because he wanted to "preserve [his] life." He testified he never saw a gun that night, and only told detectives that he had because it was what he heard.

Sullivan also testified at Harris' trial. His account was that he and Harris saw the BMW pull into the complex, but they were not at the scene when the shootings occurred. Sullivan said he had gone to a nearby gas station and Harris was at a woman's apartment.

The jury convicted Harris of the first-degree murder of Sloan, attempted second-degree murder of Overton, and criminal possession of a firearm. Harris was sentenced to a hard 50 life sentence for first-degree murder, a consecutive 233-month sentence for attempted first-degree murder, and 19 months to run concurrently for criminal possession of a firearm. The State did not submit aggravating factors or Harris' juvenile record to the jury for proof prior to sentencing. Other facts will be discussed in detail as applicable to each issue raised on appeal. Our jurisdiction is proper under K.S.A. 22-3601(b)(1) (off-grid crime; life sentence).

## ANALYSIS

*Failure to instruct on voluntary manslaughter*

Harris argues the trial court should have instructed the jury on voluntary manslaughter as a lesser included offense of first-degree murder for the passenger Sloan's death. Defense counsel requested this instruction during trial.

### *Standard of Review*

When requested, a district judge has a duty to instruct a jury on any lesser included offense established by the evidence, regardless if that evidence is weak or inconclusive. But there is no duty to instruct on a lesser included offense if the jury could not reasonably convict the defendant of the lesser included offense based on the evidence presented. When reviewing a district judge's refusal to give a requested instruction, this court must view the evidence in the light most favorable to the requesting party. *State v. Moore,* 287 Kan. 121, 130, 194 P.3d 18 (2008).

### *Discussion*

Harris was charged with first-degree murder under K.S.A. 21-3401, which prohibits the intentional and premeditated killing of a human being. Defense counsel requested a voluntary manslaughter instruction under a theory of imperfect self-defense, which is the "intentional killing of a human being committed . . . (b) upon an unreasonable but honest belief that circumstances existed that justified deadly force under K.S.A. 21-3211, 21-3212 or 21-3213 and amendments thereto." K.S.A. 21-3403. Imperfect self-defense may trigger a lesser degree of homicide, but it is not a defense to criminal liability. *State v. Nelson,* 291 Kan. 475, 481, 243 P.3d 343 (2010).

During the instructions conference, the State initially questioned whether its use of Harris' recorded interview with police raised an imperfect self-defense issue that required a lesser included manslaughter instruction. Ultimately, the State argued the instruction was not warranted because at trial Harris retracted his previous statements. But defense counsel asked for the lesser included voluntary manslaughter instruction, arguing the imperfect self-de-

fense issue was raised by the State's own evidence, which included the recorded statements. Counsel cited other evidence that supported giving the instruction, including testimony from the doctor who performed the autopsy who said he believed the shots were fired close together and at close range.

This issue arises because the State introduced the recorded statement, which contained Harris' admission that he shot both men because he believed Overton was reaching for a gun. Harris testified his statements made during the recorded interview were just a series of lies he thought necessary at the time, but that he was telling the truth at trial when he claimed he was somewhere else at the time of the shootings. Harris now argues that if the jury believed the recorded interview, then it must accept his statements in that same interview about how the shootings occurred.

The district court denied Harris' request, saying:

"Well, I see your point, [defense counsel], and it does raise it. If Mr. Harris had chosen not to take the stand, then I think you would have a better argument, quite frankly. . . .

". . . [W]hen Mr. Harris took the stand and basically said I lied, my whole statement's a lie, that's basically what his testimony was, I didn't have anything to do with this, all right? The State's argument's going to be well, his statement was true up to the point where he says there was a gun and that's why I pulled it, so, you know, there's really no basis, I don't think, to include the lesser included, particularly given that if the jury's going to believe Mr. Harris' testimony here today, he doesn't have anything to do with this, so in any event, I'm not going to instruct on that at this point."

This holding is problematic to the extent the district court concluded Harris was not entitled to the voluntary manslaughter instruction based on his statements during the recorded interview simply because he recanted his confession and contradicted it with his own trial testimony. This court recently held a defendant was entitled to lesser included offense instructions on second-degree unintentional murder and involuntary manslaughter based in part on the defendant's recanted confessions. *State v. Tahah*, 293 Kan. 267, 272, 262 P.3d 1045 (2011). So when determining whether there was some evidence to reasonably justify an imperfect self-defense theory for Sloan's killing, we must consider whether Har-

ris' recanted statements would support the lesser included offense instruction. We find they do not.

To warrant a voluntary manslaughter instruction in this instance, there needed to be evidence showing Harris had an honest belief deadly force was necessary to defend himself, but that belief was objectively unreasonable. *Nelson,* 291 Kan. at 481. But viewing the recorded statement in the light most favorable to Harris does not support a voluntary manslaughter instruction for Sloan's killing. Harris told police that he shot Overton, the driver, because he thought Overton was reaching for a gun. But this does not explain the killing of Sloan, the passenger. In fact, Harris stated in the interview that he shot and killed Sloan because he "didn't know what else to do" after Sloan said "what the fuck" in apparent surprise that Overton had just been shot.

These statements, if accepted as truthful by the jury, effectively insert a change of purpose by Harris between shooting Overton under the mistaken belief that Overton was reaching for a gun, and shooting and killing Sloan because Harris "didn't know what else to do." And regardless of whether Harris changed his story at trial from what he said at the police interview, neither his recorded interview nor his trial testimony leads to a reasonable conclusion that he believed self-defense was necessary in shooting Sloan.

We also find no corroboration for the imperfect self-defense theory in the pathology evidence Harris argues exists regarding the path of the bullet that struck Sloan's chest. Harris claims the doctor performing Sloan's autopsy testified this bullet first struck and passed through Overton's head, and then penetrated Sloan's chest. But the record reflects that the doctor only testified that the bullet was irregularly shaped and did not offer a conclusion about its path, whether it was the first bullet fired, or even whether Sloan died from the bullet in his chest rather than the bullet that struck him in the head. This limited testimony from the doctor is insufficient to support giving the requested instruction.

We hold the district court did not err in refusing to instruct the jury on voluntary manslaughter.

*Failure to instruct on attempted voluntary manslaughter*

Harris next argues the trial court should have instructed the jury on attempted voluntary manslaughter as a lesser included offense of attempted first-degree murder for the shooting of Overton. In his appellate brief, Harris claims he requested this instruction, and he predicates his arguments on that belief. But we find no evidence of such a request in the record. The court asked about this at oral argument but was not referred to any portion of the record that showed the instruction was requested.

*Standard of Review*

We review this argument under a more restrictive standard than the previous issue. When a defendant fails to request a lesser included offense instruction, appellate courts review an argument that an instruction should have been given under a clearly erroneous standard. K.S.A. 22-3414(3). Failure to give the instruction is clearly erroneous "only if the appellate court reaches a firm conviction that, had the instruction been given, there was a real possibility the jury would have returned a different verdict." *State v. Martinez,* 288 Kan. 443, Syl. ¶ 10, 204 P.3d 601 (2009).

*Discussion*

Under appropriate facts, attempted voluntary manslaughter may be considered a lesser included crime of attempted first-degree murder. *State v. Dixon,* 252 Kan. 39, 41-42, 843 P.2d 182 (1992). Harris argues his recorded interview supplies facts supporting such a lesser included crime instruction. And we acknowledge that the record reflects the vehicle's passenger compartment where the shootings took place was equipped with a wooden gear shift and a black emergency brake, which Harris argues he could have mistaken for a black gun with a clip. But even assuming for the sake of argument that the district court should have given this instruction *sua sponte* based upon the interview statements and the vehicle's interior, we are firmly convinced the instruction, if given, would have made absolutely no difference in the trial's outcome.

Overton testified that Harris attempted to sell him drugs, asking numerous times before saying, "I'll just shoot you in the head,

then." Overton also said there was a scuffle about money, and that Sullivan became agitated when the men asked for Trey. This testimony, coupled with Harris' own trial testimony stating he lied when he told police about acting in self-defense, prevents us from being firmly convinced there was a real possibility the jury would have returned a different verdict for Overton's shooting if the jury had been instructed on attempted voluntary manslaughter. Harris diminished the credibility of his recorded statements by testifying at trial that they were a lie. In addition, the surviving victim's testimony further disputes the accuracy of what Harris said in the recorded interview. We find no error in the district court's failure to give this instruction.

*Denial of Motion to Suppress Recorded Statements*

Harris next argues his recorded confession should have been suppressed because the conditions under which it was taken rendered it involuntary. Harris filed a motion to suppress before trial, which was denied after an evidentiary hearing. He renewed his objection at trial. On appeal, he advances multiple arguments supporting suppression.

### Standard of Review

In reviewing a trial court's decision regarding the suppression of a confession, an appellate court reviews the factual underpinnings of the decision by a substantial competent evidence standard and the ultimate legal conclusion by a de novo standard. The appellate court does not reweigh the evidence, assess the credibility of the witnesses, or resolve conflicting evidence. *State v. Ransom*, 288 Kan. 697, 705, 207 P.3d 208 (2009).

### Discussion

The State has the burden of proving by a preponderance of the evidence that a confession was voluntary, *i.e.*, the statement was the product of the defendant's free and independent will. A nonexclusive list of factors are considered based upon the totality of the circumstances, including: (1) the defendant's mental condition; (2) the manner and duration of the interrogation; (3) the defendant's ability to communicate with the outside world; (4) the de-

fendant's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the defendant's proficiency with the English language. *State v. McMullen*, 290 Kan. 1, 4, 221 P.3d 92 (2009). We must begin by examining what arguments were raised to the district court when it ruled on the suppression motion.

In the pretrial motion to suppress the confession, Harris alleged the recorded statements were involuntary under the totality of the circumstances because "*Miranda* warnings were not given initially and should have been" and because he was intoxicated at the time the statements were made. Harris abandoned his claim related to *Miranda* warnings on appeal, but has greatly expanded the reasons he argues on appeal that the confession was involuntary based on the factors recited in *McMullen*.

We will address each of Harris' arguments individually and cumulatively. But our standard of review is difficult to apply in this case because the district court did not make specific factual findings related to the motion to suppress. It simply stated at the conclusion of the suppression hearing that the motion was denied "[b]ased upon the evidence presented and the motions as set forth by the parties." For an appellate court, this degree of brevity makes it difficult to determine what the district court considered when denying Harris' motion, such as the weight to be given the evidence or witness credibility. But Harris has not objected to the trial court's lack of factual findings, so we proceed directly to the legal conclusions attendant to each claim without addressing whether the factual findings were supported by substantial competent evidence. *State v. Gaither*, 283 Kan. 671, 686, 156 P.3d 602 (2007) ("When a party fails to object to the lack of findings before the district court, an appellate court presumes that the district court made the factual findings necessary to support its decision.").

Harris first argues that he was intoxicated at the time of his confession after having consumed alcohol, marijuana, and cocaine earlier on the day of his recorded statements. But his contention is contradicted by his recorded statements in which he told detectives he was not under the influence of alcohol or drugs. And the interviewing detective testified at the suppression hearing and at

trial that Harris did not exhibit symptoms of intoxication, demonstrating no slurred speech, difficulty communicating, or blurry or bloodshot eyes. In addition, the recorded statements supply no clues that Harris was impaired or failed to comprehend the questions or his circumstances.

The only evidence in the record of Harris' consumption is his own testimony at trial in which he said he was lying at the time of the interview. In *State v. Hernandez*, 292 Kan. 598, 607, 257 P.3d 767 (2011), we recently stated: "This court will not infer impairment based on evidence of consumption alone." In this case, even if we accept the latter version of Harris' testimony when he claims he consumed alcohol and drugs, we are left with other evidence contradicting that testimony, including other statements by the defendant. We find no basis to conclude from this that Harris' recorded statement was involuntary.

As to Harris' complaint about the length of his detention, we hold that it does not support a finding that his statement was involuntary. Harris was arrested at the apartment complex and waited in a patrol car until police verified there was an outstanding arrest warrant for him on an unrelated charge before taking him to the station for questioning about the shootings. When he arrived, Harris waited in an interrogation room for a little over 3 hours while the woman from the disturbance was being interviewed. But once his questioning began, it lasted only about 90 minutes. The officer testified that Harris was tended to and offered water, a restroom, and a blanket. Under these conditions, the interview and accompanying circumstances do not seem excessive. See *State v. Brown*, 285 Kan. 261, 271-78, 173 P.3d 612 (2007) (confession voluntary even though defendant handcuffed to a small table in interrogation room for 12 hours); *State v. Walker*, 283 Kan. 587, 596-97, 153 P.3d 1257 (2007) (statements voluntary where defendant held for almost 13 hours and confessed to committing crime after about 8 hours); *State v. Grissom*, 251 Kan. 851, 919-20, 840 P.2d 1142 (1992) (confession voluntary where defendant handcuffed the entire time during an 8-hour interview, with breaks for meal time and restroom).

Harris next complains about his inability to communicate with others while at the police station. But this court has previously held that refusal to permit a defendant to contact others while being interviewed is not per se coercion, saying: "While isolation from the outside world can be a factor in making an interrogation coercive, it is to be expected that police will take steps to limit the ability of potential witnesses and suspects to communicate and, potentially, conspire during an investigation." *Walker*, 283 Kan. at 598.

Prior to Harris' interview, the detectives were meeting with a potential material witness, who provided information material to the shooting investigation and, more particularly, implicated Harris. So the reason for the apparent delay in beginning his interview has justification. In addition, the record reflects Harris was advised several times, beginning with his initial contact with police, of his *Miranda* rights, which included his right to contact an attorney. Harris acknowledged those rights each time. There is no claim that Harris requested an attorney and was denied one. Also, the record provides no signs of physical or psychological coercion, other than Harris' claim that temporary restraints and confinement were used in the interview room, which were attendant circumstances to the police investigation. But if Harris had been free to walk around the police station, he might have been able to make contact with the witness or someone else, or even escape. Most importantly, however, Harris does not actually argue that he made any requests to contact others that were denied by police. He simply complains that he was never told that if he wanted he could contact someone. We see nothing in the record that made Harris' claimed inability to communicate coercive.

Harris next argues he was only 18 years old at the time of the interview and that his "tender age" cuts against the voluntariness of his statements. But the record reflects that Harris had his GED and that detectives had Harris read his *Miranda* rights back to them to determine that he could read. Detectives also discussed with him the meaning of the word "coercion" to ensure he understood what this term in the *Miranda* warnings meant. We find no evidence here to show that Harris' age or education affected his ability

to interact with detectives or to answer or refuse to answer questions. See *Ransom*, 288 Kan. at 706.

Harris next claims that the manner in which detectives interrogated him was not fair because a detective lied to him about finding his fingerprints on the BMW. But this court has held that "[d]eceptive interrogation techniques alone do not establish coercion." *State v. Harris*, 279 Kan. 163, 170, 105 P.3d 1258 (2005). And we have also held a confession voluntary even when officers lied to the defendant during an interview. See, *e.g.*, *State v. Ackward*, 281 Kan. 2, 10, 128 P.3d 382 (2006) (confession voluntary even when defendant falsely told surveillance camera recorded him just prior to the shooting, that gunshot residue analysis would determine if he held a gun within the past 48 hours, and that multiple eyewitnesses were at the scene); *State v. Wakefield*, 267 Kan. 116, 128, 977 P.2d 941 (1999) (statement not involuntary where defendant falsely told that officers had information and evidence implicating him in murder, including finding his fingerprints). We find nothing coercive about the police statements in this case.

Harris next claims it was unfair to leave him in a cold room wearing only his shoes and shorts for almost 4 hours without telling him why he was detained. But a detective testified at the suppression hearing that he provided a blanket to Harris while he waited to be interviewed. He also was checked on periodically to see if he needed water or an escort to the restroom. We find these factors do not suggest his statements were involuntary.

Finally, we note there is one argument Harris makes that at first glance would appear to have some merit. He claims his statement was not voluntary because he was in custody—either in shackles or handcuffs—before his questioning began. And his testimony about this claim was not contradicted by the State's evidence during the suppression hearing, although we note it was disputed at trial when a detective testified Harris was neither shackled nor handcuffed. This testimony occurred before Harris renewed his objection to the admission of his interview statements.

We must first consider whether the initial determination from the suppression hearing may be upheld based upon the uncontradicted testimony Harris gave. The crux of the argument is that

by being in handcuffs and shackles, he was in custody during the time leading up to the confession and that his confession was involuntary because he did not feel free to leave. But while there was no conflicting evidence at the suppression hearing about whether Harris was handcuffed or shackled, there was testimony Harris was restrained by being placed in a locked room guarded by officers from the outside, and that he was not free to leave. Therefore, the trial court did have to consider testimony that Harris was not free to leave, which is the heart of Harris' argument. Our court has held that a defendant being handcuffed or shackled during an interview does not alone make a statement involuntary. See, e.g., *Brown*, 285 Kan. at 271-78 (confession voluntary even though defendant handcuffed to a small table in interrogation room); *Grissom*, 251 Kan. at 919-20 (confession voluntary where defendant handcuffed during entire 8-hour interview). We note further that at the beginning of Harris' recorded statement, Harris said he had been treated fairly by the investigating officers. So despite the conflicting evidence regarding restraints at trial, and assuming Harris was in fact handcuffed or shackled during his interview as he claimed at the suppression hearing, we hold that Harris' statements were not the result of coercion.

In summary, the essential inquiry as to whether Harris voluntarily made the incriminating statements heard in his recorded interview with police is whether they were the product of his free and independent will. *Ackward*, 281 Kan. 2, Syl. ¶ 2. Based upon the totality of circumstances, we hold that Harris' statements were voluntary. The district court did not err in finding the same.

### *Overton's pretrial identification of Harris*

Overton identified Harris from a photo lineup shown to him at the hospital while he recovered from his gunshot wounds. At trial, both the lineup display and Overton's identification of Harris from it were admitted into evidence. On appeal, Harris argues the district court erred in admitting Overton's pretrial identification of him as the shooter, claiming the identification was unreliable due to the dark conditions when the crime occurred and the construction of the photo display.

But we must first determine whether Harris' challenge was preserved. In his appellate brief, Harris treats the issue as if an objection was made to both the photo lineup exhibit and Overton's pretrial identification of Harris as the shooter. Harris then argues that the trial court erred in admitting Overton's identification of him as the shooter. The State argues this issue was not preserved because at trial Harris only objected to admission of the photo lineup as an exhibit, which was well after Overton's testimony identifying Harris.

The record supports the State's version as to how the district court proceedings unfolded. Harris' trial counsel made a single objection just as the photo display was offered into evidence, which was during the testimony of a detective. The stated basis for the objection was that the photo lineup was overly suggestive because Overton had no prior knowledge of Harris and because it was dark outside at the time of the shootings, so Overton could not have gotten a good look at the shooter. But this all happened after Overton had testified about his pretrial identification at the hospital of Harris as the person who shot him and Sloan.

The State correctly argues that the issue Harris seeks to advance in this appeal—the reliability of Overton's identification—was not preserved. By the time the objection was made, Overton had already testified about how he identified Harris from a photo lineup at the hospital. Any challenge to the reliability of Overton's identification needed to be made contemporaneously with his testimony. See K.S.A. 60-404. And Harris appears to acknowledge the preservation problem, because he argues this court may still reach the issue under one of the recognized exceptions from our prior caselaw.

But this court has recently emphasized the importance of lodging specific objections to evidence at trial and disapproved any past loosening of the K.S.A. 60-404 requirement of specific and timely objections. See *State v. King*, 288 Kan. 333, 348-49, 204 P.3d 585 (2009) ("Although our past decisions may have relaxed the objection requirement in the evidentiary context, this practice not only has led to confusion as to the standards that should be applied on appeal, but also has deemphasized the role of counsel at trial and

has impaired the gatekeeping function of district courts in this state.").We hold that the challenge to Overton's pretrial identification of Harris is not preserved for appeal.

## Denial of Motion for Mistrial

Harris next contends the district court erred in denying his motion for mistrial after a prospective juror stated he could not be fair and impartial, and incorrectly stated his understanding of a stipulation that Harris was not permitted to possess a firearm.

### Standard of Review

Under K.S.A. 22-3423(1)(c) a trial court may declare a mistrial if there was prejudicial conduct either inside or outside the courtroom that makes it impossible for the trial to proceed without injustice to either the defendant or the prosecution. This statute creates a two-step process. First, the trial court must determine if there was some fundamental failure of the proceeding. If so, the trial court moves to the second step and assesses whether it is possible to continue without an injustice. In other words, the trial court must decide if the prejudicial conduct's damaging effect can be removed or mitigated by an admonition, jury instruction, or other action. If not, the trial court must determine whether the degree of prejudice results in an injustice and, if so, declare a mistrial. *State v. Ward,* 292 Kan. 541, 550, 256 P.3d 801 (2011); see *State v. Race,* 293 Kan. 69, 80, 259 P.3d 707 (2011).

Appellate courts review a district court's ruling on a motion for mistrial for an abuse of discretion. Judicial discretion is abused if

"judicial action (1) is arbitrary, fanciful, or unreasonable, *i.e.,* if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, *i.e.,* if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, *i.e.,* if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based." *Ward,* 292 Kan. at 550.

In *Ward,* our court articulated this standard by dividing the appellate court's abuse of discretion inquiry into two parts, asking: (1) Did the trial court abuse its discretion when deciding if there was a fundamental failure in the proceeding and (2) did the trial court abuse its discretion when deciding whether the conduct re-

sulted in prejudice that could not be cured or mitigated through jury admonition or instruction, resulting in an injustice? 292 Kan. at 551.

The analysis of the first question varies with the nature of the alleged misconduct, such as when the allegation is based on the actions of a witness, the actions of a bystander, prosecutorial misconduct, or evidentiary error. 292 Kan. at 551. Appellate courts reviewing the second part for an injustice may take a broader view than the trial court because appellate courts may examine the entire record. The degree of certainty required to conclude an injustice did not occur varies depending on whether the fundamental failure infringes on a constitutional right or not. To declare a nonconstitutional error harmless the appellate court must apply K.S.A. 60-261 and K.S.A. 60-2105 to determine if there was a reasonable probability that the error affected the trial's outcome. And if the fundamental failure infringes on a right guaranteed by the United States Constitution, the appellate court applies the constitutional harmless error analysis defined in *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967). *Ward*, 292 Kan. at 569.

### Discussion

At trial, the State asked during voir dire whether any potential jurors had experience in analyzing fingerprints. One juror, referred to by the parties as Juror #47, replied he had taken fingerprints for "KCKPD" and had also worked for the Bureau of Alcohol, Tobacco, and Firearms. When asked whether he could be fair and impartial, the juror replied, "Truthfully, the third charge you read, criminal possession of a firearm, that's stuff that I investigate. I do not think I could be fair and impartial." He went on to say, "Basically from what I've understood and the charges you read, I think both parties had agreed to criminal possession of a firearm. Felon in possession of a firearm, in the Federal statute." He stated again he could not be fair and impartial. The State then asked to remove the juror for cause, and defense counsel said, "Judge, we don't have—" before the State interrupted and asked to approach the bench. At the bench, the parties discussed whether the panel was

prejudiced by the prospective juror's statements and whether to clear up the misunderstanding to the entire panel. Harris said he would ask for a mistrial. The State argued the prejudice did not rise to a level warranting a mistrial. The district court quickly denied Harris' motion.

The transcript excerpt was read back at the parties' request at the bench. The court then openly clarified to the juror in front of the remaining panel that there was no stipulation as to Harris' guilt on the firearm count, only a stipulation to one of the elements, and that the State still had to prove all elements in order to obtain a guilty verdict on that count.

Even with this explanation, Juror #47 acknowledged he would have a problem remaining fair and impartial. The court then asked the juror to approach the bench to clear up his reservations about serving. At the bench the juror seemed unclear about what the stipulation was, saying he thought it meant the parties agreed that Harris had a gun. The court corrected him by saying the stipulation was that Harris' status prohibited him from having a gun, not that he actually had one. The juror replied that even if he were instructed otherwise, he would draw inferences from that stipulation. After that exchange, Juror #47 was released from the jury panel. After the verdict, Harris filed a motion for new trial based on the remaining jury panel's exposure to what had happened in the process of excluding Juror #47. The court denied the motion.

In our review of the record, the substantive portion of the discussion concerning possession of the gun occurred in detail at the sidebar and outside the jury panel's hearing, so the only substantive issue is whether there was prejudice when Juror #47 consistently said he could not be fair and impartial. This court has previously held that a juror expressing strong feelings of partiality in front of the jury panel does not warrant a mistrial in the absence of a showing of substantial prejudice. *State v. McCorgary*, 224 Kan. 677, 687, 585 P.2d 1024 (1978).

Similarly in this case, there is no showing of prejudice. In fact, Harris does not argue that Juror #47 *did* prejudice the jury. In his brief, he says the juror's credentials coupled with his statements "was *likely* to prejudice the jury." But in the absence of any show-

ing of substantial prejudice, we find the trial court did not abuse its discretion in declining to grant Harris a mistrial. The court's explanation to the jury panel that the parties stipulated to only one of multiple elements, coupled with the absence of any indication of prejudice to the defendant, convinces us this argument is without merit.

*Aggravating factors to impose hard 50 sentence*

Harris next argues the hard 50 scheme is unconstitutional because it imposes additional punishment based on factors not submitted to the jury, and asks this court to revisit its decision in *State v. Conley*, 270 Kan. 18, 11 P.3d 1147 (2000), *cert. denied* 532 U.S. 932 (2001), which affirmed the hard 50 scheme. This court has previously declined to revisit or overrule *Conley* and has also affirmed a defendant's hard 50 sentence despite the claim that the sentencing scheme violated the defendant's Sixth and Fourteenth Amendment rights. See *State v. Washington*, 280 Kan. 565, 574, 123 P.3d 1265 (2005), *cert. denied* 549 U.S. 1018 (2006) (Hard hard 50 sentence upheld after defendant convicted of first-degree murder argued *Apprendi* required aggravating factors to be submitted to the jury and asked the court to overrule *Conley*).

Similar rejections to challenges to the hard 50 sentencing scheme, as well as declined invitations to revisit *Conley*, are found in *State v. Foster*, 290 Kan. 696, 699, 233 P.3d 265 (2010); *State v. Kirtdoll*, 281 Kan. 1138, 1151, 136 P.3d 417 (2006); *State v. Oliver*, 280 Kan. 681, 707-08, 124 P.3d 493 (2005), *cert. denied* 547 U.S. 1183 (2006); *State v. James*, 279 Kan. 354, 358, 109 P.3d 1171 (2005); *State v. Buehler-May*, 279 Kan. 371, 386, 110 P.3d 425, *cert. denied* 546 U.S. 980 (2005); *State v. Robertson*, 279 Kan. 291, 308, 109 P.3d 1174 (2005); *State v. Hurt*, 278 Kan. 676, 686-88, 101 P.3d 1249 (2004); *State v. Wilkerson*, 278 Kan. 147, 160, 91 P.3d 1181 (2004); *State v. Hebert*, 277 Kan. 61, 107-08, 82 P.3d 470 (2004); and *State v. Douglas*, 274 Kan. 96, 111-12, 49 P.3d 446 (2002), *cert. denied* 537 U.S. 1198 (2003). Harris provides no additional authority or facts not already included in these previous decisions that would warrant reconsideration of the issue.

*Proof of Prior Juvenile Convictions*

Harris argues that because he did not have a right to a jury trial when he obtained the juvenile charges that were used in sentencing, the prior juvenile adjudications must have been pleaded in the charging document and proven to a jury beyond a reasonable doubt because they were facts increasing the penalty for a crime beyond the prescribed statutory maximum. This exact argument was considered and denied by this court in *State v. Fischer*, 288 Kan. 470, 472-76, 203 P.3d 1269 (2009) (juvenile adjudications final on June 20, 2008, the date this court filed *In re L.M.*, 286 Kan. 460, 186 P.3d 164 [2008]), which permits juvenile jury trials, may be included in an offender's criminal history score); *State v. Hitt*, 273 Kan. 224, 236, 42 P.3d 732 (2002), *cert. denied* 537 U.S. 1104 (2003) ("Juvenile adjudications need not be charged in an indictment or proven to a jury beyond a reasonable doubt before they can be used in calculating a defendant's criminal history score under the KSGA."). Harris' presentence investigation report indicates he had three felony convictions on his juvenile record—two from 2004 and one from 2006. The convictions occurred before the *L.M.* decision, and he was not entitled to have those convictions referred to a jury prior to sentencing. Harris provides no additional authority or facts not already included in these previous decisions that would warrant reconsidering the issue.

Affirmed.