(310 P.3d 426)
No. 107,965

STATE OF KANSAS, *Appellee*, v. ISIDRO VILLA-VASQUEZ, *Appellant*.

Opinion filed September 13, 2013.

*Adam Stolte* and *Ryan Eddinger*, of Kansas Appellate Defender Office, for appellant.

*J. Scott James*, assistant county attorney, *Terry J. Malone*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before BUSER, P.J., MCANANY and POWELL, JJ.

MCANANY, J.: Isidro Villa-Vasquez was convicted of animal cruelty and various drug crimes. On the appeal of his drug convictions, he contends that the district court erred in admitting testimony regarding "narco saint" religious icons and their association with drug traffickers. He also contends we should reverse all his convictions because the court erred in permitting the State to exercise peremptory challenges with respect to two Hispanic prospective jurors contrary to his equal protection rights as determined in *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

*Facts*

Based on the information provided by a confidential informant, law enforcement officers secured a search warrant for Villa-Vasquez' residence. During the search, the officers found drugs and drug paraphernalia in Villa-Vasquez' bedroom.

The officers also found in Villa-Vasquez' basement various religious icons arranged with candles into a shrine honoring Jesus Malverde, who is not recognized by the Catholic Church or any other religious organization but who is considered by drug traffickers to be their patron saint. The shrine also contained a statue of Santa Muerte, a cult figure revered by drug criminals and by the Mexican poor but denounced by the Catholic Church; a book containing rituals for worshipping Santa Muerte; candles depicting San Ramon (a 13th century Catholic saint whose lips were pierced with a hot poker and padlocked together) with pennies taped over his mouth; and a broken statue of Saint Michael the Archangel, the patron saint of law enforcement.

The State filed a pretrial motion to certify United States Marshal Robert Almonte as an expert witness on the subject of shrines and icons used by drug dealers. The State contended that Almonte was an expert whose testimony was relevant to show Villa-Vasquez' intent to distribute drugs and that Almonte's testimony would aid the jury in understanding the purpose of the shrine the officers found.

At the conclusion of the first day of trial, the district court held a hearing on the State's motion and its proffer of Almonte's testimony. Almonte testified that he was a United States marshal for the western district of Texas who had worked in law enforcement since 1978, including approximately 13 years overseeing a narcotics task force in El Paso, Texas. According to Almonte, it was common to encounter shrines and altars during the execution of search warrants in drug cases.

Almonte researched how individuals involved in crime prayed to different icons for protection from law enforcement. Almonte studied case reports and photographs of scenes depicting narco saints found by other officers. Almonte said he had talked to traffickers

who had similar shrines about the connection between drug trafficking and the use of these shrines.

Almonte also travelled to Mexico to visit these shrines and to study the topic. He created a law enforcement training video called "Patron Saints of the Mexican Drug Underworld," which he has presented to law enforcement officers around the nation. Almonte has testified in federal court as an expert witness on the topic of narco saints. He testified that the association between the presence of narco saints and drug activity is quite high.

Over Villa-Vasquez' objection, the district court found that Almonte was qualified as an expert under K.S.A. 60-456. The court found that "Almonte has that specialized knowledge that goes beyond what a normal lay juror would understand," and the testimony would be helpful for the jury to understand the significance of the evidence found in Villa-Vasquez' basement. Further, the court found that Villa-Vasquez' challenge to Almonte's association of these icons to drug dealers goes to the weight rather than to the admissibility of this testimony.

The court then recessed for the day. The following morning, the State presented the testimony of two witnesses before calling Almonte to the stand. The first was a witness who was recalled for brief additional testimony on the animal cruelty charge. The second was a police officer involved in conducting the search of Villa-Vasquez' house. She identified photos of Villa-Vasquez' basement, including photos of the shrine. The photos and the items depicted in the photos were admitted into evidence without objection. The officer testified, without objection, that the photos were taken "because these appear to us to be a shrine, some of which are depicting saints that we often see in the drug trafficking business."

Almonte then testified at trial. Villa-Vasquez did not lodge a timely and specific objection to Almonte's credentials as an expert or to the substance of Almonte's testimony, other than to lodge a hearsay objection when, in testifying about the development of his expertise in the area, Almonte testified that he interviewed drug suspects "at least 50 times, maybe more, maybe 100 or more." When the prosecutor asked what these people told him, Almonte answered, over Villa-Vasquez' overruled hearsay objection, that he

"was told by several of these people that they would use these items and pray to these various items, and icons, and saints, for protection from law enforcement."   .

Almonte testified that "a lot of these drug traffickers were invoking the spiritual world for protection against law enforcement." He told the jury that the photographs of the narco saints found in Villa-Vasquez' basement were consistent with drug trafficking and other criminal activities. According to Almonte, individuals involved in criminal activity pray to these particular icons for protection from law enforcement officials.

Almonte testified that the small statuette of Jesus Malverde represented the original narco saint. Jesus Malverde was originally a bandit who was likened to a Mexican Robin Hood. He testified that drug traffickers identified with Jesus Malverde because they wanted to rationalize their illegal activities based upon their donations of some of their drug money back to the community.

Referring to photographs of the shrine, Almonte also identified statues of Santa Muerte, a figure who is not recognized by the Catholic Church as a saint. He also identified a book containing rituals for Santa Muerte, prayers to Santa Muerte, and directions on setting up shrines.

Almonte testified about the candles found in the shrine which contained the image of San Ramon, a recognized Catholic saint. The image depicted a padlock on the saint's mouth. According to Almonte, many criminals prayed to San Ramon because "he can keep people quiet about what they're doing."

Almonte also noted the broken statue of Saint Michael, the patron saint of law enforcement. Almonte said the statue is broken in an effort to protect the criminals from law enforcement.

Almonte could not conclude that persons praying at such a shrine necessarily were drug traffickers, but he opined there is an association between drug traffickers and maintaining a shrine such as the one found in Villa-Vasquez' basement.

Following Almonte's testimony, Villa-Vasquez' wife testified briefly under a grant of immunity. She claimed that she had not spoken with Kansas Bureau of Investigation Special Agent Chris Turner about "things in the basement . ,. . witch things." Turner

was then called to impeach Villa-Vasquez' wife. He testified without objection:

"Q. Did [Villa-Vasquez' wife] say anything to you about the basement area of the Marshal Road property in regard to a shrine or objects that were utilized by Mr. Villa-Vasquez?

"A. Specifically that there were spooky items in the basement, that there were witch things in the basement, statues. And, she had spoken about he does things to insure—I can't remember specifically, or, exactly what she said, things to either deter or identify if somebody has been in the room."

Villa-Vasquez testified that he constructed the shrine after his mother's death and denied any association between the shrine and drug trafficking. Following Villa-Vasquez' convictions and sentencing, he brought this appeal.

*Standard of Review*

In our review of the district court's ruling on the admission of evidence, our Supreme Court has prescribed a multistep protocol. See *State v. Shadden*, 290 Kan. 803, 817, 235 P.3d 436 (2010). For the first step, we determine whether the evidence is relevant. Evidence is relevant when it has "any tendency in reason to prove any material fact." K.S.A. 60-401(b). As such, relevant evidence must be both probative and material. *State v. Martinez*, 290 Kan. 992, 1009, 236 P.3d 481 (2010). Whether evidence is probative is reviewed under an abuse of discretion standard, and materiality is judged under a de novo standard. *Shadden*, 290 Kan. at 817.

For the second step, we determine which rules of evidence or other legal principles apply. The district court's conclusion is reviewed de novo. 290 Kan. at 817. For the third step, we review the district court's application of the rule or principle. This application is reviewed either for abuse of discretion or de novo, depending on the rule or principle being applied. Some rules and principles grant the district court discretion, while others raise matters of law. 290 Kan. at 817.

But we need not dwell on every step in the *Shadden* analysis. *State v. King*, 288 Kan. 333, 348-350, 204 P.3d 585 (2009), teaches that without a contemporaneous objection at the time evidence is

admitted, the propriety of its admission has not been preserved for appellate review. K.S.A. 60-404 provides:

"A verdict or finding shall not be set aside, nor shall the judgment or decisions based thereon be reversed, by reason of the erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection."

See *State v. Harris*, 293 Kan. 798, 813-14, 269 P.3d 820 (2012). Notwithstanding a prior ruling on the admissibility of evidence, the objecting party is required to renew any objections at the time the testimony is introduced into evidence at trial. *State v. Breedlove*, 295 Kan. 481, 488, 490, 286 P.3d 1123 (2012); see *State v. Carapezza*, 286 Kan. 992, 1002, 191 P.3d 256 (2008) (defendant objected on sole basis of hearsay; thus, she failed to preserve for appeal the issue of the inadmissibility of the evidence under K.S.A. 60-455).

Thus, we consider the failure to preserve an issue for review by a contemporaneous objection the functional equivalent of simply not arguing a point or conceding it on appeal. This creates a situation similar to the one in *State v. Holt*, No. 106,711, 2013 WL 517657, at *3 (Kan. App. 2013) (unpublished opinion), in which this court observed: "Holt does not argue on appeal that evidence of his prior convictions for theft . . . was irrelevant for either impeachment or substantive purposes, and thus this court need not address the first step of the multistep evidentiary analysis." In fact, in *Shadden* the Supreme Court did not dwell on the relevancy step of its own multistep analysis regarding a field sobriety test because "[a]pplying the multistep evidentiary standard, the first step—relevance—is not in issue." 290 Kan. at 818.

*Expert Testimony*

Villa-Vasquez' sole contemporaneous objection was a hearsay objection to Almonte's testimony. Thus, we need not consider the relevancy step in the *Shadden* protocol in deciding wither the district court abused its discretion in admitting this evidence. See *State v. Miller*, 42 Kan. App. 2d 12, 21-22, 208 P.3d 774 (2009), *aff'd* 293 Kan. 535, 264 P.3d 461 (2011). We turn directly to the hearsay issue.

• *Hearsay*

Almonte testified that he travelled to Mexico and around the United States speaking to law enforcement officials and drug traffickers about the narco saints and their significance. Villa-Vasquez objected to Almonte's testimony on the grounds of hearsay. The State countered that the testimony was not offered to prove the truth of the matter asserted but rather was presented to establish the basis for Almonte's claimed expertise on the subject of narco saints. The court overruled Villa-Vasquez' objection. We review the district court's rejection of Villa-Vasquez' hearsay objection for any abuse of discretion. See *Miller*, 42 Kan. App. 2d at 21-22.

K.S.A. 2012 Supp. 60-460 defines hearsay as "[e]vidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated." Thus, the issue here is whether this testimony was offered to prove the truth of the matter asserted.

Villa-Vasquez relies on *State v. Gonzalez*, 282 Kan. 73, 143 P.3d 18 (2006). *Gonzalez* does not apply. In *Gonzalez*, the defendant sought to have a doctor testify that the defendant was not competent to stand trial. The doctor testified that she had attempted to conduct a psychological evaluation on the defendant but found him to be uncooperative. Thus, her expert opinion was based "largely on written records from the California penal system and, to a lesser extent, on the videotaped interview with Anaheim police, on the Larned evaluation, and on conversations with defendant's attorneys and jailers." 282 Kan. at 82. The district court rejected the doctor's testimony on the grounds of hearsay.

In *Gonzalez*, the doctor's opinion was offered to prove the truth of the matter asserted: that the defendant was not competent to stand trial. The opinion on that subject was found in the California records and other out-of-court sources which were hearsay, and no attempt was made to offer the underlying records pursuant to any exception to the hearsay rule. The doctors in California apparently opined that Gonzalez was incompetent, an opinion that could not be tested in cross-examination.

Here, however, Almonte did not interview 100 or more individuals to get their views on whether Villa-Vasquez was a drug dealer.

There is no indication any of his interviewees even knew Villa-Vasquez or knew he maintained a shrine honoring Jesus Malverde and others. Almonte's testimony regarding these interviews was offered to establish that through his experience he had obtained a wealth of background material on the connection between the honoring of narco saints and drug trafficking.

In *Gonzalez*, the rejected opinion testimony related to whether the defendant was competent to stand trial. The doctor made no observations of the defendant upon which to base an opinion of his mental state because of the defendant's failure to cooperate. Thus, she merely adopted the opinions of others. Here, Almonte formed his opinion regarding Villa-Vasquez' shrine and its association with drug dealers from examining photos of the actual shrine and figures taken from the shrine Villa-Vasquez maintained in his basement. But he made clear he was not expressing an opinion on whether Villa-Vasquez was a drug dealer. He merely testified to the association between the shrines and persons in the illicit drug trade.

Almonte was not an academically trained expert. He gained his expertise from law enforcement work in the field. The foundation knowledge for an academically trained expert comes from class lectures and studies that lead to the student's degrees and other forms of academic recognition. A considerable portion of that knowledge may come from the oral pronouncements of professors in their lectures, pronouncements that are unsworn statements not subject to cross-examination. We reject the notion that such "hearsay" statements from a college professor in a class lecture undermine the student's later authority to speak as an expert, just as we reject the notion that Almonte's law enforcement work, including speaking with drug dealers and others involved in drug crimes, undermined his expertise.

In *Helter Skelter*, his book about the Charles Manson murder trial, prosecutor Vincent Bugliosi noted at the outset that it was going to be a long trial when one of the defendants' counsel objected to asking the People's first witness to state his name because the question called for hearsay: the witness' recounting what his

mother said his name was. We decline Villa-Vasquez' invitation to trod such a path.

As a subset of his hearsay argument, Villa-Vasquez argues that Almonte, who had no "formal training in anthropology, religious studies, ethno-history, or any related field," relied on knowledge he accumulated over the years in his law enforcement work, much of which came in the form of hearsay—unsworn and untested observations from criminal defendants charged with drug crimes and law enforcement officials who encountered these shrines. Thus, Villa-Vasquez argues, Almonte was not qualified to render an expert opinion. Villa-Vasquez suggests that Almonte's opinion is based solely on his Catholic background and his curiosity about narco saints and shrines. We will not rise to the bait in the form of Villa-Vasquez' proposition that knowledge and expertise prompted by intellectual curiosity is somehow suspect.

Villa-Vasquez failed to object to Almonte's qualifications when Almonte testified at trial. But even if we consider Villa-Vasquez' current argument as a subset of his hearsay argument, the fact that Almonte's expertise came from his experiences in a nonacademic setting does not render him unqualified to express opinions in his area of expertise. Other courts have examined the manner in which Almonte gained his expertise and have so held. See *United States v. Guererro*, No. DR-09-CR-820, unpublished opinion filed May 10, 2011 (W.D. Tex.), Slip op. at *1-6; *United States v. Goxcon-Chagal*, 885 F. Supp. 2d 1118 (10th Cir. 2012); *United States v. Bobadilla-Campos*, 839 F. Supp. 2d 1230 (D. N.M. 2012). As the court noted in *Goxcon-Chagal*:

"Almonte's expert opinion relies largely on his experience as a law enforcement officer. The Tenth Circuit has acknowledged that experience and training are generally the basis upon which experts rely to provide testimony regarding the modus operandi of drug organizations. See *United States v. Garza*, 566 F.3d [1194,] 1199-1200 [10th Cir. 2009]." *Goxcon-Chagal*, 885 F. Supp. 2d at 1148-49.

In Kansas, a law enforcement officer dealing with gang activity in Wichita, who developed a significant part of his expertise in the field as did Almonte, was allowed to render expert opinions on the

topic of gangs. See *State v. Tran*, 252 Kan. 494, 847 P.2d 680 (1993). There, the court stated:

"As the Wichita gang intelligence officer, Carey is required to gather information on Wichita gangs and gang-related activity. Officer Carey, in his capacity as gang intelligence officer for SCAT, has accumulated knowledge and information unique to the field of gangs and gang activity. Carey was able to provide the jury with information not generally known regarding gang characteristics and indicia of membership in a specific gang." 252 Kan. at 502.

The fact that Almonte gained some of his expertise in ways Villa-Vasquez attempts to characterize as hearsay did not disqualify him from rendering his expert opinion about the association between narco saints and drug dealers.

- *Relevance*

Villa-Vasquez argues that Almonte's opinion regarding the alleged correlation between narco saints and drug-trafficking was not relevant. Villa-Vasquez failed to object to Almonte's testimony at trial on the grounds of relevance, so this issue has not been preserved for appeal, and we can bypass this step in the multistep *Shadden* analysis.

There is no Kansas case directly in point, but had Villa-Vasquez properly preserved the issue for appeal, it would not have been a winner in light of the high burden of showing an abuse of judicial discretion (*State v. Berriozabal*, 291 Kan. 568, 586, 243 P.3d 352 [2010]; *State v. Wells*, 289 Kan. 1219, 1227, 221 P.3d 561 [2009]), and in light of the holdings on the issue of the relevance of this type of testimony found in *State v. Obregon*, No. 104,584, 2011 WL 5526551 (Kan. App. 2011) (unpublished opinion), *rev. denied* February 20, 2013; *United States v. Pena-Ponce*, 588 F.3d 579, 582 (8th Cir. 2009); *United States v. Caballero*, 417 Fed. Appx. 500, 502, 507 (6th Cir. 2011); *United States v. Lopez-Gutierrez*, 334 Fed. Appx. 880 (10th Cir. 2009); *Bobadilla-Campos*, 839 F. Supp. 2d at 1234; *United States v. Favela-Lujan*, No. 10-3232, unpublished opinion filed January 21, 2011 (D. N.M.); *United States v. Rivas*, No. 4: 02CR3205, 2003 WL 22400238, at *1-2 (D. Neb. 2003) (unpublished opinion); *People v. Islas*, No. F040734, 2003

WL 21465341, at \*5-6 (Cal. App. 2003) (unpublished opinion); and *State v. Alverez*, 147 P.3d 425, 432-33 (Utah 2006).

- *Prejudice*

Villa-Vasquez also argues that Almonte's testimony regarding the alleged correlation between narco saints and drug trafficking was unduly prejudicial. Here, the KBI agent, who was called to impeach Villa-Vasquez' wife, testified that she told the agent that there were "spooky items" or "witch things" in the basement. Villa-Vasquez claims this testimony, to which no objection was lodged, encouraged the jury to convict him on the basis of his religious beliefs and to speculate about the risks posed to society as a result of his beliefs.

Because Villa-Vasquez failed to make this objection at trial, he has not preserved it for appeal and we do not consider it. Besides, the KBI agent's testimony was not admitted for the purpose of establishing Villa-Vasquez' religious beliefs. The issue was not Villa-Vasquez' religious beliefs but rather the connection between persons who honor narco saints and similar icons to persons involved in criminal activity. The evidence was limited to the significance of the items found in Villa-Vasquez' basement and their potential connection to those involved in drug trafficking.

- *Harmless Error*

As his final argument on this issue, Villa-Vasquez claims that the error in admitting Almonte's testimony was not harmless because the evidence against him was "purely circumstantial." We conclude that if the question put to Almonte is considered to have called for hearsay, the error was harmless.

Under K.S.A. 60-261 and 60-2105, an error in the admission of evidence is not grounds for setting aside a judgment if the trial court's ruling did not have a prejudicial effect on substantial rights of a party. See *State v. Ransom*, 289 Kan. 373, 388, 212 P.3d 203 (2009).

It is axiomatic that even the most serious crime can be proven through circumstantial evidence. *State v. Richardson*, 289 Kan. 118, 127, 209 P.3d 696 (2009). But here, the evidence was far more

than circumstantial. In the search of Villa-Vasquez' house, the authorities discovered about 20 grams of cocaine, along with scales, baggies, and a cutting agent. The items were found in Villa-Vasquez' bedroom, and they were identified as belonging to him. A confidential informant, Manuel Gonzalez, testified to discussions and transactions that clearly linked Villa-Vasquez to the drug trade.

Here, the claimed hearsay to which Villa-Vasquez objected did not relate to the substances of Almonte's opinions but only to one small facet of Almonte's expertise accumulated over 25 years of active service in law enforcement and since then in his research and study during his retirement. Had the prosecutor framed his question to Almonte so as to make clear that the professional experiences that led to Almonte's expertise included talking to drug suspects and left it at that, rather than seeking to elicit what those suspects had to say, we are satisfied that the outcome of the trial would not have been different because Almonte's substantive testimony would have been the same.

We find no reversible error in Almonte's answer to this single question put to him about this one aspect of his accumulated expertise.

## Jury Selection

Turning to Villa-Vasquez' second issue, he claims the State exercised peremptory challenges to eliminate the only two Hispanics from the jury panel in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution under *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). He argues that the district court failed to make a credibility determination regarding the State's proffered race-neutral reasons for striking these prospective jurors.

In considering the State's use of its peremptory challenges, we first determine whether the defendant has made a prima facie showing that the challenges were made on the basis of race. This is a question of legal sufficiency subject to plenary review. Next, we consider whether the State provided a race-neutral explanation for striking the prospective jurors. The State's explanation need not be persuasive or even plausible but merely facially valid. Unless

a discriminatory intent is inherent in the State's explanation, the reason offered will be deemed neutral. Finally, because the defendant always bears the ultimate burden of persuasion, we consider whether the defendant has met the burden of proving purposeful discrimination. Because the district court is in a better position to view the demeanor of prospective jurors and attorneys during voir dire, the district court's ruling on a *Batson* challenge will not be disturbed on appeal unless it amounts to an abuse of discretion. *State v. Hill*, 290 Kan. 339, 359-60, 228 P.3d 1027 (2010).

The State offered racially neutral reasons for both peremptory strikes. With respect to the first prospective juror, the prosecutor stated that he "never responded or responded to any of the questions during *voir dire*, just no eye contact. Also, it seemed like on his questionnaire he may have been—potentially worked with the Defendant based on my knowledge of where the defendant worked when these charges arose."

With respect to the second prospective juror, the prosecutor expressed concern that he worked at night: "I don't think he is half awake right now. He said he already worked through the night. So, even if he could make arrangements for tonight, he didn't sleep yet."

Defense counsel responded that possible work connection between the first prospective juror and Villa-Vasquez was based on pure speculation. He further noted that this prospective juror did not answer any questions because there was no need to respond. Regarding the second prospective juror, defense counsel noted that the prospective juror stated that he could probably find someone to work for him that night and noted that this prospective juror did not appear any more tired than the rest of the jurors.

The district court ruled: "It doesn't appear to this Court that the Defendant has raised . . . a systematic exclusion of Hispanics in this panel. The reasons given for [striking] both [of the potential jurors] appear on their face to be racially neutral. The Court denies the *Batson* challenge."

Villa-Vasquez argues that the district court failed to make a credibility determination regarding the State's proffered race-neutral

reasons for striking these prospective jurors and that the facts did not support the district court's findings. But Villa-Vasquez failed to preserve the issue on appeal by failing to object to the district court's analysis of the issue. A party must object to the district court's failure to complete the final step of a *Batson* analysis to preserve the issue for appeal. Further, the district court's analysis of the final *Batson* step can be implied from its consideration of the State's reasons for striking these prospective jurors and the defendant's counter-argument. See *State v. Angelo*, 287 Kan. 262, 274-75, 197 P.3d 337 (2008) (noting the better practice for a district court faced with a *Batson* challenge is to identify and follow each step, but concluding that the defendant did not prove purposeful discrimination).

With respect to the first prospective juror's nonresponsiveness, in *State v. Pham*, 281 Kan. 1227, 1238, 136 P.3d 919 (2006), the State struck a prospective juror because he "did not answer any questions from the State or Defense, even with so much as a nod of the head, demonstrating that he either was not listening or simply had no interest in being in the courtroom." Our Supreme Court upheld this reason as facially valid. 281 Kan. at 1238-39.

With respect to the second prospective juror's lack of sleep, in *Forrest v. State*, 757 N.E.2d 1003, 1005 (Ind. 2001), the State struck the only African-American from the panel because she had only 45 minutes of sleep the night before. Noting the deferential standard of review, the court found no error in the district court's decision to overrule the defendant's objection and permit the peremptory challenge. 757 N.E.2d at 1005.

In this case, the State provided race-neutral reasons for striking both jurors. Although the district court did not explicitly state its reasoning under the final step, it obviously heard and considered the defense's rebuttal argument before making its decision. See *McCullough*, 293 Kan. at 994. Villa-Vasquez has not shown that the district court abused its discretion in its *Batson* analysis.

Affirmed.