No. 123,559

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

FRANK RAYMOND CRUDO,
*Appellant*.

SYLLABUS BY THE COURT

1.

The exigent circumstances which allow warrantless searches of motor vehicles also allow warrantless searches of a fifth-wheel camper attached to a vehicle that is traveling on a public roadway and is so situated that an objective observer would conclude it was not being used as a residence at the time of the search.

2.

If officers have probable cause to search a vehicle, they have probable cause to search containers inside and attached to the outside of the vehicle which they have probable cause to believe may contain contraband or evidence of a crime. This includes searching a fifth-wheel camper attached to a vehicle when both are traveling on a public roadway in the possession and control of the defendant.

Appeal from Geary District Court; BENJAMIN J. SEXTON, judge. Opinion filed September 2, 2022. Affirmed.

*Peter Maharry*, of Kansas Appellate Defender Office, for appellant.

*Tony Cruz*, assistant county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before CLINE, P.J., ISHERWOOD and HURST, JJ.

CLINE, J.: Frank Raymond Crudo appeals the district court's (1) denial of his motion to suppress, (2) admission of alleged expert testimony by one officer which he contends should have been disclosed under K.S.A. 60-456(b), (3) jury instruction stating the jury could infer an intent to distribute based on the amount of drugs found in the camper, and (4) denial of his motion to vacate based on double jeopardy violations. He also seeks reversal of his possession of marijuana conviction on double jeopardy grounds.

After carefully reviewing the record, we find no error and affirm.

FACTS

In January 2014, Frank Raymond Crudo's pickup truck and attached fifth-wheel camper were stopped for a traffic infraction. Officers searched the pickup after the officer who approached it smelled a strong odor of raw marijuana when the window was rolled down. They found a small piece of marijuana inside the pickup and then searched the camper, where they found 19 vacuum-sealed bags of marijuana underneath the bathtub and a small amount of marijuana (along with rolling paper and a grinder) under the stairs.

The State charged Crudo with: (1) possession of marijuana with intent to distribute in violation of K.S.A. 2013 Supp. 21-5705(a)(4) and (a)(7), a drug severity level 2, nonperson felony; (2) no drug tax stamp in violation of K.S.A. 79-5204(a) and 79-5208, a severity level 10, nonperson felony; (3) possession of marijuana in violation of K.S.A. 2013 Supp. 21-5706(b)(3) and/or (b)(7), a class A nonperson misdemeanor; and (4) conspiracy to possess marijuana with the intent to distribute in violation of K.S.A. 2013 Supp. 21-5302(a), a severity level 2, nonperson felony.

2

*Motion to Suppress*

Crudo was initially successful in suppressing the marijuana discovered in the camper. But after the State filed an interlocutory appeal, a panel of this court reversed and remanded the case for a new hearing on Crudo's motion to suppress before a different judge. *State v. Crudo*, No. 112,805, 2015 WL 7162274, at *13 (Kan. App. 2015) (unpublished opinion).

The new judge scheduled a hearing on the motion in September 2016. Crudo never appeared and was not before the court again until his arrest in 2019 for his failure to appear in 2016.

The district court held a new evidentiary hearing in November 2019 but ultimately denied Crudo's motion. The court clarified that its decision depended solely on the evidence presented at the November 2019 hearing. The case then proceeded to jury trial.

*First Trial*

At trial, Lieutenant Christopher Ricard testified that he stopped the pickup after noticing the tag lamp on the camper was not illuminated and, when he ran the camper's registration through dispatch, the dispatcher told him there was no record of that registration. It was later determined a mistake occurred in the officer's relaying of the tag numbers and the dispatcher entering those numbers into the system, despite the officer's clarifying questioning of the dispatcher. But this mistake does not impact the appeal.

Upon stopping the pickup, Lt. Ricard approached the passenger side. Although Crudo was the registered owner of both the pickup and attached camper, he was in the back seat and another individual was driving. Lt. Ricard smelled a strong odor of raw marijuana coming from the pickup when the window was rolled down.

After Lieutenant Justin Stopper arrived as backup, Lt. Ricard told Crudo they planned to search the pickup. Crudo became combative to the point where the officers had to handcuff and place him inside a patrol car.

During their search of the pickup, the officers discovered a small piece of marijuana on the transmission hump between the passenger and driver's seats. They then obtained keys to the camper and searched it. They discovered 19 vacuum-sealed bags of marijuana beneath the bathtub in the camper. Some of these bags had writing which appeared to reflect the strain of marijuana contained within. Lt. Ricard testified that based on his training and experience, this quantity of marijuana would be consistent with possession with the intent to distribute. He confirmed none of the bags had any sort of drug tax stamp on them.

Lt. Ricard also testified a small amount of marijuana was found under the stairs along with rolling paper and a grinder—items he explained were consistent with personal use. But he clarified that finding rolling paper and a grinder in a different portion of the camper did not change his opinion that possession of 19 bags of marijuana was consistent with an intent to distribute.

The jury found Crudo guilty of possession of marijuana and possession of marijuana with no drug tax stamp but hung on the possession of marijuana with intent to distribute charge. At that point, the State told the district court it intended to retry Crudo on the possession of marijuana with intent to distribute charge. The State asked the court to declare a mistrial on that charge, which it did.

*Motion to Vacate*

After his first trial, Crudo moved to vacate, raising two double jeopardy arguments. He argued his convictions for possession of marijuana and possession of

4

marijuana with no drug tax stamp were multiplicitous. He also argued his conviction for possession of marijuana was a lesser included crime of possession of marijuana with intent to distribute and, as a result, the State could not retry him. The district court denied Crudo's motion.

*Second Trial*

When the State retried Crudo for possession of marijuana with intent to distribute, the jury returned a verdict of guilty.

*Sentencing*

The district court designated count one, possession of marijuana with the intent to distribute, as the base sentence, with sentences for the other counts to run concurrently. The court then granted Crudo's motion for a dispositional departure and sentenced him to 36 months' probation with an underlying 108-month prison term.

Crudo timely appealed.

ANALYSIS

*The district court correctly denied Crudo's motion to suppress.*

Crudo argues the warrantless search of his camper violated his rights under the Fourth Amendment and section 15 of the Kansas Constitution Bill of Rights so the district court should have suppressed the evidence found there. Crudo contends this search was impermissible because: (1) the automobile exception should not extend to the camper, and (2) the officers had no probable cause to believe the camper contained contraband.

5

*Standard of Review*

Usually, when reviewing a motion to suppress, an appellate court reviews the district court's findings of fact to determine whether they are supported by substantial competent evidence and reviews the ultimate legal conclusion de novo. *State v. Cash*, 313 Kan. 121, 125-26, 483 P.3d 1047 (2021). But when the material facts supporting the court's decision are not in dispute, the question for this court—whether to suppress—is one of law, and we exercise unlimited review. *State v. Hanke*, 307 Kan. 823, 827, 415 P.3d 966 (2018).

*Applicable Law and Analysis*

"'[A] warrantless search by a police officer is per se unreasonable under the Fourth Amendment unless the State can fit the search within one of the recognized exceptions to the warrant requirement.'" *State v. Doelz*, 309 Kan. 133, 140, 432 P.3d 669 (2019). One recognized exception is probable cause plus exigent circumstances, and a subclass of this exception is the "automobile exception." 309 Kan. at 140, 143. "The automobile exception provides that a warrant is not required to search a vehicle as long as 'probable cause exists to believe the vehicle contains contraband or evidence of a crime' and the vehicle is 'readily mobile.'" 309 Kan. at 143.

*The automobile exception applies to the camper.*

Crudo first challenges the search of the camper by arguing the automobile exception that allowed for a warrantless search of the pickup did not extend to the camper. He argues the justifications which underly the automobile exception—(1) the "'practical challenges of obtaining a warrant for a vehicle that could be "quickly moved" out of the jurisdiction,'" and (2) the vehicle operator's reduced expectation of privacy in the operation of a vehicle on a roadway—do not support the application of this exception to the camper.

6

While Crudo contends the camper is not a vehicle and "could not be rapidly moved," he acknowledges courts have found trailers are mobile which brings them under the automobile exception, citing *United States v. Navas*, 597 F.3d 492, 499-500 (2d Cir. 2010) (finding tractor trailer was inherently mobile because it could be towed away); *United States v. Smith*, 456 Fed. Appx. 200, 209 (4th Cir. 2011) (unpublished opinion) (finding that tractor trailer "clearly was inherently mobile"). But he argues these holdings are too broad and should not apply to the camper since it could not move on its own. Analogizing a camper to a residence, he argues expanding the exception to attached campers and trailers "allows for a highly intrusive search into the private lives of individuals and their personal possessions."

Crudo relies on *Collins v. Virginia*, 584 U.S. ___, 138 S. Ct. 1663, 201 L. Ed. 2d 9 (2018), to support his argument that the automobile exception should not be extended to the camper. In *Collins*, officers claimed the automobile exception allowed a warrantless search of a motorcycle covered with a tarp and parked in a driveway. But the United States Supreme Court disagreed, holding: "[T]he automobile exception does not permit an officer without a warrant to enter a home or its curtilage in order to search a vehicle therein." 138 S. Ct. at 1675. We find *Collins* distinguishable since it involved officers "physically intruding on the curtilage of Collins' home to search the motorcycle," which invaded Collins' Fourth Amendment interest in both the motorcycle and the curtilage of his home. 138 S. Ct. at 1671. Here, Crudo's camper was neither being used as a residence nor was it parked within the curtilage of one when it was searched—it was attached to a pickup traveling down a public roadway.

When extending the automobile exception to a motor home in *California v. Carney*, 471 U.S. 386, 393, 105 S. Ct. 2066, 85 L. Ed. 2d 406 (1985), the United States Supreme Court refused to distinguish vehicles based on their capability of functioning as a home, noting: "In our increasingly mobile society, many vehicles used for transportation can be and are being used not only for transportation but for shelter, *i.e.*, as

7

a 'home' or 'residence.'" 471 U.S. at 393. Instead, the court noted the automobile exception "has never turned on the other uses to which a vehicle might be put," but "has historically turned on the ready mobility of the vehicle, and on the presence of the vehicle in a setting that objectively indicates that the vehicle is being used for transportation." 471 U.S. at 394.

In *United States v. Hill*, 855 F.2d 664 (10th Cir. 1988), a defendant challenged the warrantless search of his houseboat, claiming it was more like a home than a vehicle, so the automobile exception did not apply. In upholding the search, the Tenth Circuit relied on the fact that the houseboat was navigating the lake when officers boarded it, so it was readily mobile and not being used as a residence at the time of the search. 855 F.2d at 667-68. Additionally, in *United States v. Ervin*, 907 F.2d 1534 (5th Cir. 1990), the Fifth Circuit upheld the warrantless search of a fifth-wheel camper officers had followed to a motel parking lot. That court applied the automobile exception to the camper after finding it was readily mobile and so situated that an objective observer would conclude it was not being used as a residence while parked at a motel parking lot and not a place regularly used for residential purposes. 907 F.2d at 1537-39.

Had the camper been unhitched, parked at a campsite, and being used as a residence, that situation would be more analogous to *Collins*. But here, as in *Carney*, *Hill*, and *Ervin*, the camper was readily mobile (since it was attached to the pickup), and it was being used for transportation rather than a residence (since it was traveling down a public roadway).

As for the second justification for the automobile exception, the United States Supreme Court discussed the rationale underlying vehicle operators' reduced privacy right in the context of the automobile exception in *Carney*, 471 U.S. at 392:

8

"'Automobiles, unlike homes, are subjected to pervasive and continuing governmental regulation and controls, including periodic inspection and licensing requirements. As an everyday occurrence, police stop and examine vehicles when license plates or inspection stickers have expired, or if other violations, such as exhaust fumes or excessive noise, are noted, or if headlights or other safety equipment are not in proper working order.'

"The public is fully aware that it is accorded less privacy in its automobiles because of this compelling governmental need for regulation. Historically, 'individuals always [have] been on notice that movable vessels may be stopped and searched on facts giving rise to probable cause that the vehicle contains contraband, without the protection afforded by a magistrate's prior evaluation of those facts. [Citations omitted.]"

Like vehicles, campers are subject to extensive regulation when traveling on a roadway. See K.S.A. 8-1401 et seq. (defining terms in Kansas' Uniform Act Regulating Traffic); K.S.A. 8-1501 et seq. (containing the "Rules of the Road"); K.S.A. 8-1701 et seq. (containing regulation on the "Equipment of Vehicles"); K.S.A. 8-1901 et seq. (containing regulations for the "Size, Weight and Load of Vehicles"). And these regulations provide law enforcement with the legal authority to stop and examine campers and trailers attached to vehicles traveling down the public roadway—just like Lt. Ricard did here. See K.S.A. 8-1759a; K.S.A. 8-1910; *Smith v. Kansas Dept. of Revenue*, 291 Kan. 510, 511, 242 P.3d 1179 (2010) (officer initiated stop because tail lights on trailer being pulled by pickup truck not working); *Lewis v. Kansas Dept. of Revenue*, No. 110,721, 2014 WL 6777438, at *1 (Kan. App. 2014) (unpublished opinion) (trooper initiated stop after observing driver hauling trailer without working tail lights on highway); *State v. Smith*, No. 101,831, 2009 WL 5062492, at *1 (Kan. App. 2009) (unpublished opinion) (trooper pulled over defendant, who was driving a pickup pulling a trailer, because trailer did not have working tail lights).

Thus, we find both the mobility distinction and reduced privacy expectation which justify the automobile exception similarly apply to attached campers traveling down a

public roadway. Based on this analysis, we find the exigent circumstances which allow warrantless searches of motor vehicles also allow warrantless searches of a fifth-wheel camper attached to that vehicle when it is traveling on a public roadway and is so situated that an objective observer would conclude it was not being used as a residence when it was searched. The district court did not err in extending the automobile exception to Crudo's camper.

*Probable cause supported the camper search.*

Crudo next challenges the camper search by claiming it was not supported by probable cause. The automobile exception only satisfies the Fourth Amendment's warrant requirement; probable cause to believe the camper contained contraband or evidence of a crime is still required. *Doelz,* 309 Kan. at 143. "The probable cause analysis reviews the totality of the circumstances to determine the probability that the vehicle contains contraband or evidence." 309 Kan. at 143.

Neither party contests that the officers' detection of the odor of marijuana emanating from the pickup provided probable cause to search the pickup—they simply disagree as to the proper scope of that probable cause. The State argues detection of this odor and the discovery of marijuana in the pickup provided probable cause to search both the pickup and the camper. Crudo contends the officers had no probable cause to search the camper since they did not smell marijuana coming from it and they only found a small amount of marijuana after searching the pickup.

The district court relied on three cases in finding the officers' probable cause to search the pickup extended to the camper. The first was *State v. Specht*, No. 106,272, 2012 WL 1970108 (Kan. App. 2012) (unpublished opinion), which involved the warrantless search of an enclosed camper shell attached to the back of a pickup. As in Crudo's case, officers searched Specht's pickup after smelling a strong odor of marijuana

emanating from the cab area. And, also like here, they searched the camper shell after discovering marijuana in the pickup's cab. In *Specht*, the district court suppressed the drug evidence discovered in the camper shell because there were no odors emanating from the camper shell. But this court overturned that decision after finding the officers' discovery of marijuana in Specht's pickup cab provided sufficient probable cause to search the rest of the pickup, which included the enclosed camper shell. 2012 WL 1970108, at *7.

We agree with the district court that, while a camper shell is different from a fifth-wheel camper, the premise set forth in *Specht* still applies. As in *Specht*, the camper search was not based only on the odor of marijuana emanating from the truck—the officers discovered corroborating evidence of contraband in the truck before searching the camper. "[O]nce a police officer lawfully discovers contraband in the passenger compartment of a vehicle, probable cause exists to search the remainder of the vehicle, including a trunk or camper shell, for additional evidence of contraband." 2012 WL 1970108, at *7. Just like this court found in *Specht*, it was reasonable for the officers to believe Crudo's camper might contain additional evidence of illegal drugs. And Crudo cites no authority to support his contention that the quantity of marijuana found in the truck negates that probable cause.

The district court also relied on *United States v. Millar*, 543 F.2d 1280 (10th Cir. 1976), which addressed whether the detection of the odor of marijuana coming from and discovery of marijuana seeds within the vehicle pulling a U-Haul trailer provided officers probable cause to search the trailer. The difference in *Millar* is the officers applied for a search warrant, while the officers here did not. Yet Millar challenged the affidavit in support of the search warrant on the same basis that Crudo challenges the camper search: both alleged marijuana odor coming from the vehicle where marijuana was ultimately found did not provide sufficient probable cause to search a trailer or camper attached to that vehicle.

11

In upholding the search warrant, the *Millar* court found it "unrealistic" to isolate the trailer from the vehicle that was pulling the trailer. 543 F.2d at 1283. Instead, it found the vehicle and trailer constituted a unit for purposes of the search. In so finding, the *Millar* court noted the trailer was attached to the vehicle and both were ostensibly traveling to the same destination. The court found the officer's detection of the odor of marijuana coming from the vehicle, coupled with finding seeds on the floorboard, provided probable cause to search the vehicle's trunk and then analogized the trailer search to a trunk search. It also found it important that Millar was in possession and control of both the automobile and the U-Haul trailer. It distinguished this situation from *United States v. Rodriguez*, 525 F.2d 1313 (10th Cir. 1975), where it held discovery of marijuana under a tarp in a trailer being pulled by a commercially operated bus did not support probable cause to search the baggage of the 12 paying passengers on the bus. *Millar*, 543 F.2d at 1283.

We similarly find it unrealistic to treat Crudo's pickup and camper separately for purposes of this search. Crudo was in possession and control of the pickup and attached camper, which were also both ostensibly traveling to the same destination. Once the officers discovered marijuana in the pickup, they had probable cause to search the attached camper for additional drug evidence.

The last case the district court relied on in denying Crudo's motion to suppress was *State v. Finlay*, 257 Or. App. 581, 307 P.3d 518 (2013). As in *Millar*, the Oregon appellate court viewed a vehicle and its attached trailer as one unit. It found that attaching a trailer to a vehicle expands the automobile exigency exception to the trailer, since the trailer now had the ability to move and be mobile. 257 Or. App. at 593 (noting the "'quality of mobility is as true for the trailer attached to defendant's pickup as for the pickup itself'"). The *Finlay* court "fail[ed] to see a significant distinction between searching containers *inside* a vehicle, which is permitted under the automobile exception . . . and searching containers attached to the *outside* of a vehicle." 257 Or. App. at 593

(citing *State v. Brown*, 301 Or. 268, 721 P.2d 1357 [1986]). We agree with the district court that this logic is sound and supported by the findings in *Specht* and *Millar*.

We also note that in *State v. Overbey*, 790 N.W.2d 35, 42 (S.D. 2010), the South Dakota Supreme Court found probable cause existed to search an attached fifth-wheel camper after a drug dog alerted to the cab of the pickup. That court found the pickup and attached fifth-wheel camper were one unit once attached and the camper was "subject to search as long as the motor vehicle exception was satisfied as to any part of the pickup or camper." 790 N.W.2d at 42. Similarly, in *United States v. Torres*, No. 3-:05-CR-051, 2005 WL 3546677, at *7-8 (S.D. Ohio 2005) (unpublished opinion), the court found officers had probable cause to search the locked trailer of a tractor-trailer rig once a drug dog alerted on the tractor since it determined the tractor trailer should be treated as one unit.

Based on these cases, we find the automobile exception applies to the fifth-wheel camper attached to Crudo's vehicle. And once officers had probable cause to search Crudo's vehicle, they had probable cause to search containers inside and attached to the outside of that vehicle which they had probable cause to believe may contain contraband or evidence of a crime. This includes a camper attached to a vehicle when both are traveling on a public roadway in the possession and control of the defendant.

*The district court properly exercised its discretion when finding Lieutenant Ricard's testimony was not expert testimony under K.S.A. 60-456(b).*

In his next claim of error, Crudo argues several portions of Lt. Ricard's testimony constituted expert testimony under K.S.A. 2021 Supp. 60-456(b), and because the State did not comply with the expert disclosure requirements in K.S.A. 2021 Supp. 22-3212(b)(2), the district court erred in allowing it. He contends the following was expert testimony:  (1) the packaging and quantity of marijuana found in the camper suggested an

13

intent to distribute; (2) wholesale marijuana prices; and (3) "the 'patterns' of marijuana traffickers"—specifically, that "the product is purchased in the western states and travels east on 'short trips,'" and that "traffickers would try to spend as little time on the road as possible as that increases the likelihood of being stopped." He argues these errors warrant reversal because the State's case for the intent to distribute charge hinged on this expert testimony and the quantity of drugs found.

*Preservation*

Crudo argues he preserved this issue because he objected to Lt. Ricard's testimony as improper expert testimony when the State asked Lt. Ricard whether the drugs found in the camper would reflect the intent to distribute. While we find Crudo preserved his objection to the first two portions of Lt. Ricard's testimony, he fails to identify the location in the second jury trial transcript where he objected to the third portion of testimony that he challenges—Lt. Ricard's testimony about "the 'patterns' of marijuana traffickers"—specifically, that "the product is purchased in the western states and travels east on 'short trips,'" and that "traffickers would try to spend as little time on the road as possible as that increases the likelihood of being stopped." Thus, the record reflects he only preserved a portion of the challenged testimony for our review. See *State v. Ballou*, 310 Kan. 591, Syl. ¶ 6, 613-14, 448 P.3d 479 (2019) ("A timely interposed objection, as required by the plain language of K.S.A. 60-404, is one that gives the district court the opportunity to make the ruling contemporaneous with an attempt to introduce evidence at trial.").

*Standard of Review*

We review the district court's decision as to whether Lt. Ricard's testimony was expert or lay opinion testimony and its admission of this testimony using an abuse of discretion standard. *State v. Aguirre*, 313 Kan. 189, 195, 485 P.3d 576 (2021); *State v.*

*Hubbard*, 309 Kan. 22, 43-48, 430 P.3d 956 (2018) (analyzing whether officers' testimony about having smelled raw marijuana was lay or expert opinion testimony, concluding it was lay opinion testimony and, as a result, holding district court did not abuse its discretion in admitting testimony; citing *State v. Sasser*, 305 Kan. 1231, 1243, 391 P.3d 698 [2017]).

*Applicable Law*

The statute governing opinion testimony, K.S.A. 2021 Supp. 60-456, provides:

"(a) If the witness is not testifying as an expert, the testimony in the form of opinions or inferences is limited to such opinions or inferences as the judge finds: (1) Are rationally based on the perception of the witness; (2) are helpful to a clearer understanding of the testimony of the witness; and (3) are not based on scientific, technical or other specialized knowledge within the scope of subsection (b).

"(b) If scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue, a witness who is qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise if: (1) The testimony is based on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has reliably applied the principles and methods to the facts of the case."

Crudo relies on K.S.A. 2021 Supp. 22-3212(b)(2), which states:

"The prosecuting attorney shall also provide a summary or written report of what any expert witness intends to testify to on direct examination, including the witness' qualifications and the witness' opinions, at a reasonable time prior to trial by agreement of the parties or by order of the court."

And Crudo asserts that subsection (i) of that statute "authorizes the district court to 'prohibit the party from introducing into evidence the material not disclosed.'" In full, subsection (i) states:

"If, subsequent to compliance with an order issued pursuant to this section, and prior to or during trial, a party discovers additional material previously requested or ordered which is subject to discovery or inspection under this section, the party shall promptly notify the other party or the party's attorney or the court of the existence of the additional material. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this section or with an order issued pursuant to this section, the court may order such party to permit the discovery or inspection of materials not previously disclosed, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may enter such other order as it deems just under the circumstances." K.S.A. 2021 Supp. 22-3212(i).

*Lay or Expert Opinion Testimony*

The State counters that it did not have to follow K.S.A. 2021 Supp. 22-3212(b) because Lt. Ricard's testimony was lay opinion testimony under K.S.A. 2021 Supp. 60-456(a)—not expert opinion testimony under K.S.A. 2021 Supp. 60-456(b). The State argues that Lt. Ricard testified to his opinion based on what he personally witnessed in his professional career as a law enforcement officer. It also notes the training he received pertaining to drug distribution did not fall into the category of specialized, scientific, or complex subject matter that would require a court to find him to be an expert witness. Last, it contends Crudo knew about Lt. Ricard's proposed trial testimony on these issues since he provided similar statements in his probable cause affidavit and in his testimony at the preliminary hearing (to which Crudo did not object).

The State cites *Hubbard* in support, where, according to the State, the "Kansas Supreme Court discussed the distinction between lay and expert opinion in regards to an officer's testimony regarding their recognition of the odor of marijuana," and "f[ound]

16

that the district court did not abuse its discretion in admitting the officer's testimony, as lay witnesses."

In *Hubbard*, two police officers testified that they had smelled raw marijuana. On appeal, the Kansas Supreme Court analyzed whether the officers' testimony became expert opinion testimony because they had also testified their ability to identify marijuana odor came from their training and experience as police officers. 309 Kan. at 44-46. The *Hubbard* court first turned to *Sasser*, another case about the distinction between lay and expert opinion testimony, and noted: "In *Sasser*, the critical feature for the majority that made the testimony admissible as a lay opinion was that the special knowledge on which the [opinion] was based was not '*so . . . specialized* that it cried out for greater court control.'" *Hubbard*, 309 Kan. at 45. The *Hubbard* court also quoted *Osbourn v. State*, 92 S.W.3d 531, 537 (Tex. App. 2002), stating: "Similarly, '[w]hile smelling the odor of marihuana smoke may not be an event normally encountered in daily life, it requires limited, if any, expertise to identify.'" *Hubbard*, 309 Kan. at 45.

The *Hubbard* court found the officers' testimony about smelling raw marijuana was lay opinion testimony and admissible under K.S.A. 2017 Supp. 60-456(a). The court based this conclusion on the officers' opinions not being "'highly technical,'" stating: "[W]e are confident it is within the realm of common human experience to smell something and subsequently be able to recognize that same odor again." 309 Kan. at 45-46 (supporting its conclusion with the quote from *State v. Loudermilk*, 221 Kan. 157, 163, 557 P.2d 1229 [1976]: "'Whether a small wound is a cut or a puncture and whether it is old or new, would not appear *highly technical*.'" [Emphasis added.]). Lastly, in responding to the dissent's argument that the officers were giving expert opinion testimony because they had been exposed to raw marijuana from police training and on-the-job experience, the court found that the "officers did not learn how to smell at the police academy," *Hubbard*, 309 Kan. at 46, and clarified:

"'There are certain fields where a witness may qualify as an expert based upon experience and training, however, use of the terms "training" and "experience" do not automatically make someone an expert. All opinions are formed by evaluating facts based on life experiences including education, background, training, occupation, etc. While [the police officer] may have had the potential to be qualified as an expert because she possessed knowledge, skill, experience and education, she was not testifying as an expert when she identified the marihuana. Rather, she was testifying based on her firsthand sensory experiences. [The police officer] herself smelled the odor that she perceived to be burnt marihuana. The fact that she had smelled marihuana before in *the course of her employment as a police officer does not necessarily make her an expert. And, again, even if she was an expert, that would not preclude her from offering a lay opinion about something she personally perceived*." 309 Kan. at 46 (quoting *In re Ondrel M.*, 173 Md. App. 223, 244-45, 918 A.2d 543 [2007]).

Having determined the officers' testimony was lay opinion testimony, the *Hubbard* court determined the district court did not abuse its discretion by admitting the testimony. 309 Kan. at 43, 46, 48.

> *Lt. Ricard's testimony that the marijuana's quantity and packaging are consistent with the intent to distribute*

Crudo challenges testimony Lt. Ricard provided in both trials on the basis that it improperly supported the intent to distribute charge. But since Crudo was convicted of this charge in the second trial, we do not consider testimony from the first trial.

In the second trial, Lt. Ricard testified that, based on his law enforcement training, the quantity and packaging of the 19 vacuum-sealed bags of marijuana were consistent with the intent to distribute. Following our Supreme Court's conclusion in *Hubbard*, we find this testimony was lay opinion. Concluding that 19 vacuum-sealed bags of marijuana, labeled with strain names, which appeared to be of equal weight (approximately one pound), would evidence an intent to distribute does not involve a

"'highly technical'" matter. See *Hubbard*, 309 Kan. at 45-46. Rather, it is "within the realm of common human experience" to know that marijuana packaged in this way would be intended for distribution rather than personal use. See 309 Kan. at 45-46. Thus, as in *Hubbard*, we find the district court did not abuse its discretion in admitting this testimony. See 309 Kan. at 43, 46, 48.

*Lt. Ricard's testimony about marijuana prices*

Crudo also claims Lt. Ricard's testimony on marijuana prices constituted expert testimony—specifically, his testimony that the wholesale price of marijuana on the West Coast ranged from $1,200 to $1,600 per pound, and that the same marijuana would be worth $4,500 to $6,000 per pound on the East Coast. Lt. Ricard stated this testimony was based upon drug interdiction training he received as part of his required 40 hours of annual training. He testified this training included how drug traffickers operate, bulk marijuana traffickers, and wholesale marijuana prices.

Crudo relies on two cases for his contention that Lt. Ricard's testimony rose to the level of an expert—*State v. Villa-Vasquez*, 49 Kan. App. 2d 421, 310 P.3d 426 (2013), and *State v. Tran*, 252 Kan. 494, 847 P.2d 680 (1993). Crudo asserts that in *Villa-Vasquez*, "this Court found the State's witness was an expert, even though he had no formal training. Rather, his expertise was based on his 'law enforcement work in the field' studying narco-saints." But the statement Crudo cites does not provide a complete representation of the expert's credentials in *Villa-Vasquez*. There, the expert was a United States marshal from Texas who was an expert on shrines used by drug dealers. He worked in law enforcement since 1978 and spent 13 of those years overseeing a narcotics task force in Texas—where it was common for him to encounter shrines in drug cases. He then researched how criminals prayed to icons for protection from law enforcement, studied case reports and photos of scenes depicting narco saints, talked to drug traffickers with shrines about the connection between the shrines and drug trafficking, traveled to

19

Mexico to visit shrines and study the topic, created a law enforcement training video on the topic, and presented that training video to officers around the nation. 49 Kan. App. 2d at 423-24.

On the other hand, Lt. Ricard has not developed an expertise on the subject at issue like the expert in *Villa-Vasquez*. Rather, Lt. Ricard's training on marijuana prices was merely included in the annual training all officers had to undergo.

The second case Crudo relies on, *Tran*, is similarly distinguishable. The expert there was a Wichita gang intelligence officer who accumulated knowledge and information on gangs and gang activity through his position. 252 Kan. at 502. Both cases Crudo cites predate the changes to K.S.A. 60-456 in 2014, but more recent caselaw appears to similarly require the officer to have received specialized training to be considered an expert. See L. 2014, ch. 84, § 2; see, e.g., *State v. Claerhout*, 310 Kan. 924, 932, 934-35, 453 P.3d 855 (2019) (finding officer to be qualified as expert in reading crash data retrieval when officer testified to having "training, proficiency testing, and extensive experience in accident reconstruction and using crash data retrieval").

Like his testimony about the packaging and quantity of marijuana, we do not find Lt. Ricard's testimony about wholesale drug prices to constitute the type of "scientific, technical or other specialized knowledge" which is contemplated by K.S.A. 2021 Supp. 60-456(b) or K.S.A. 2021 Supp. 22-3212(b)(2). Observations about wholesale drug prices do not require significant expertise nor are they based on any scientific theory. See *Osbourn*, 92 S.W.3d at 537. Such testimony is also not "based on information that was so scientific, technical, or specialized that it cried out for greater court control." *Sasser*, 305 Kan. at 1246-47. The district court did not abuse its discretion in admitting testimony about the quantity and packaging of the marijuana or wholesale marijuana prices.

*The district court erred when instructing the jury, but it did not affect the trial's outcome.*

Crudo next argues the district court erred in instructing the jury that it could "'infer that the defendant had the intent to distribute marijuana, if the defendant possessed more than 450 grams of marijuana.'" In full, the challenged jury instruction, which Crudo acknowledges followed PIK Crim. 4th 57.022 (2013 Supp.), provides:

> "You may infer that the defendant had the intent to distribute marijuana, if the defendant possessed more than 450 grams of marijuana.
> "The inference may be considered by you along with all other evidence in the case. You may accept or reject it in determining whether the State has met the burden to prove that the defendant had the intent to distribute marijuana. This burden never shifts to the defendant."

Crudo argues the instruction was erroneous because it violated the Due Process Clause along with the constitutional right to a jury trial mandate that "the jury find each fact necessary for a conviction beyond a reasonable doubt." He asserts that "[m]andatory presumptions in jury instructions are problematic because they deprive a criminal defendant of due process protections afforded under [the] Fourteenth Amendment to [the] United States Constitution." Finally, he contends that for the possession with the intent to distribute charge, the State had the burden to prove both possession and the intent to distribute the marijuana, but the court's instruction reduced the State's burden of proof regarding the intent to distribute, thus this error warrants reversal because it affected the verdict. We are not persuaded.

The Kansas Supreme Court recently took up the precise issue Crudo raises in *State v. Holder*, 314 Kan. 799, 801-02, 502 P.3d 1039 (2022). Holder was charged with the same crime as Crudo—possession with the intent to distribute under K.S.A. 2020 Supp. 21-5705(a)(4)—and, also like Crudo, challenged a jury instruction based on PIK Crim. 4th 57.022. The court found the instruction did not accurately reflect the applicable law

21

because it allowed for a "permissive inference" of an intent to distribute based on the quantity of drugs, where the statute on which the instruction is patterned, K.S.A. 2020 Supp. 21-5705(e), provides for a "*rebuttable presumption*." (Emphasis added.) 314 Kan. at 800, 804-07. The court explained the distinction between the two concepts:

> "'A rebuttable presumption does not remove the presumed element from the case but nevertheless requires the jury to find the presumed element unless the accused persuades the jury otherwise. That is, once the State proves certain facts, the jury must infer [the element] from those facts, unless the accused proves otherwise. . . .
>
> "'An instruction containing a permissive inference does not relieve the State of its burden because it still requires the State to convince the jury that an element, such as intent, should be inferred based on the facts proven.'" 314 Kan. at 805 (quoting *State v. Harkness*, 252 Kan. 510, Syl. ¶¶ 13-14, 847 P.2d 1191 [1993]).

The court applied Kansas' "rebuttable presumption" definition to K.S.A. 2020 Supp. 21-5705(e), explaining, "the statutory rebuttable presumption means that once the State proved possession of 450 grams or more of marijuana, the jury *must* infer [the defendant's] intent to distribute unless he proved otherwise." (Emphasis added.) *Holder*, 314 Kan. at 805.

The court concluded the instruction in *Holder* was legally erroneous because it did not accurately reflect the law. We similarly find the instruction here was legally inappropriate and erroneous. See 314 Kan. at 803 (noting one step in the multi-step standard of review for claims of jury instruction error involves determining if the instruction was legally appropriate).

Having determined the jury was instructed in error, we must now decide whether the error requires reversal. *State v. Holley*, 313 Kan. 249, 253, 485 P.3d 614 (2021). Because Crudo preserved the claimed instructional error, we apply the constitutional harmless error standard. See 313 Kan. at 256-57 ("[W]hen an instructional error impacts

22

a constitutional right, this court assesses 'whether the error was harmless under the federal constitutional harmless error standard, *i.e.*, whether there was "no reasonable probability" that the error contributed to the verdict.'").

As the court did in *Holder*, we find the instructional error was harmless. First, we do not find the permissive inference instruction reduced the State's burden to prove Crudo's intent to distribute marijuana. *Holder*, 314 Kan. at 807 (applying a clear error standard since Holder did not preserve his jury instruction argument). Not only did the instruction specifically reference the State's burden to prove Crudo's intent to distribute marijuana, but it also told the jury it could accept or reject the permissive inference that Crudo had an intent to distribute depending on whether the State met its burden. And it reminded the jury that the "burden never shifts to the defendant."

Next, the erroneous jury instruction contained a permissive inference, which was beneficial to Crudo in comparison to K.S.A. 2021 Supp. 21-5705(e)'s rebuttable presumption. If the court had not erred and, instead, applied the "rebuttable presumption" in K.S.A. 2021 Supp. 21-5705(e)(1), once the State proved possession of 450 grams or more of marijuana—which it did when the forensic chemist testified to the gross weight of the 19 bags of marijuana being 9.34 kilograms (i.e., 9,340 grams)—the jury would have had to infer that Crudo had the intent to distribute, unless he proved otherwise. See *Holder*, 314 Kan. at 805. Here, instead of being told it must presume the intent to distribute based on the quantity of marijuana (unless Crudo proved otherwise), the jury was told it could accept or reject the inference of such intent. The permissive inference arguably heightened the burden of proof on this charge for the State beyond what is required by K.S.A. 2021 Supp. 21-5705(e), yet the jury still convicted Crudo. If the jury found the evidence sufficient to convict Crudo under this heightened standard, we fail to see how there would be no reasonable probability it would convict under the lesser standard. See *United States v. Pinson*, 542 F.3d 822, 832-33 (10th Cir. 2008) ("An incorrect instruction that is beneficial to the defendant is generally not considered

23

prejudicial."; citing *Killian v. United States*, 368 U.S. 231, 258, 82 S. Ct. 302, 7 L. Ed. 2d 256 [1961]).

Last, even setting aside the beneficial aspect of the instruction, given the evidence presented (including the quantity, packaging, and labeling of the 19 bags of marijuana), we find no reasonable probability the instructional error affected the trial's outcome. We do not find the jury would have reached a different verdict had the instructional error not occurred.

As for Crudo's constitutional argument, like in *Holder*, even if we found the statutory rebuttable presumption unconstitutional (an issue we do not reach here), Crudo's due process rights were not violated since the rebuttable presumption was not applied to him at trial. See *Holder*, 314 Kan. at 807-08. Crudo suffered no prejudice from the error about which he complains.

*Crudo's protection against double jeopardy was not violated.*

"[T]he Double Jeopardy Clause of the Fifth Amendment 'protects against: (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense.'" *State v. Dale*, 312 Kan. 174, 178, 474 P.3d 291 (2020) (quoting *State v. Schoonover*, 281 Kan. 453, 463, 133 P.3d 48 [2006]). Like the United States Constitution, the Kansas Constitution also prohibits a criminal defendant from being "'twice put in jeopardy,'" and the Kansas Supreme Court has interpreted the Kansas and federal double jeopardy provisions as providing a criminal defendant with the same protections. *State v. Hensley*, 298 Kan. 422, 435, 313 P.3d 814 (2013); see U.S. Const. amend. V; Kan. Const. Bill of Rights, § 10. A defendant's argument under any of the three categories of protection raises a question of law over which this court has unlimited review. *Dale*, 312 Kan. at 178.

Crudo argues (1) his convictions for possession of marijuana and for no drug tax stamp at the first trial were multiplicitous—or in other words, they were two separate punishments for the same offense, and (2) his conviction for possession of marijuana at the first trial barred a retrial on the possession of marijuana with intent to distribute charge because K.S.A. 2021 Supp. 21-5109(b) bars a conviction for both a greater and lesser offense. Possession of marijuana is a lesser included offense of possession of marijuana with intent to distribute. To prevail on either of these arguments, Crudo must establish the crimes at issue arise from the "same offense." *Dale*, 312 Kan. at 178.

The State denies these convictions were multiplicitous because it notes the jury could have only found Crudo guilty of the no drug tax stamp charge based on the 19 bags of marijuana found under the bathtub—not the marijuana found in the pickup or underneath the stairs in the camper. It points out the only testimony the jury heard pertaining to the weight of marijuana related to the 19 bags of marijuana found underneath the bathtub.

*Invited Error*

Before we analyze Crudo's claims, we must address the State's argument that Crudo invited the error and cannot complain about it on appeal. The State contends Crudo deliberately avoided requesting a lesser included instruction as to count 1—the possession with the intent to distribute charge—to nullify the jury. The State argues, "It was an all or nothing defense, that did not go in the defendant's favor, and no[w] the defense is attempting to argue that it now constitutes double jeopardy." But Crudo correctly notes the invited error doctrine does not apply. The issue he raised on appeal stems from whether the convictions are multiplicitous—not on the district court's failure to instruct the jury on a lesser-included offense.

*Relevant Facts*

The State charged Crudo with four counts in the complaint:

(1) possession of marijuana with intent to distribute in violation of K.S.A. 2013 Supp. 21-5705(a)(4) and (a)(7), "a drug severity level 2, nonperson felony (450grams-30kg)." Based on a review of the statute for this offense, the State's reference to "(450grams-30kg)" corresponds to K.S.A. 2013 Supp. 21-5705(d)(2)(C), which provides that a "[v]iolation of subsection (a) with respect to material containing any quantity of marijuana, or analog thereof, is a: . . . (C) drug severity level 2 felony if the quantity of the material was *at least 450 grams but less than 30 kilograms*." (Emphasis added.)

(2) no drug tax stamp, a severity level 10 nonperson felony, in violation of K.S.A. 79-5204(a) and K.S.A. 79-5208. The State alleged that Crudo, "a dealer of marijuana or other controlled substances as defined by K.S.A. 79-5201, unlawfully, feloniously and intentionally possessed such a controlled substance [*to wit: over 28 grams of marijuana*] upon which a tax is imposed without having affixed thereto an official stamp or other indicia of tax payment." K.S.A. 79-5201(c) provides that "'dealer' means any person who, in violation of Kansas law, manufactures, produces, ships, transports or imports into Kansas or in any manner acquires or possesses *more than 28 grams of marijuana . . . .*" (Emphasis added.) The statutes under which Crudo was charged reference a "dealer," which thereby incorporates the definition's weight requirement. See K.S.A. 79-5204(a) ("No *dealer* may possess any marijuana . . . upon which a tax is imposed pursuant to K.S.A. 79-5202, and amendments thereto, unless the tax has been paid as evidenced by an official stamp or other indicia." [Emphasis added.]); K.S.A. 79-5208 ("Any *dealer* violating this act is subject to a penalty of 100% of the tax in addition to the tax imposed by K.S.A. 79-5202 and amendments thereto. In addition to the

26

tax penalty imposed, a *dealer* distributing or possessing marijuana . . . without affixing the appropriate stamps, labels or other indicia is guilty of a severity level 10 felony." [Emphases added.]).

(3) possession of marijuana, a class A nonperson misdemeanor, in violation of K.S.A. 2013 Supp. 21-5706(b)(3) or (b)(7). The State did not specify a weight for the marijuana it alleged Crudo possessed for this crime.

(4) conspiracy to possess marijuana with the intent to distribute, a severity level 2, nonperson felony, in violation of K.S.A. 2013 Supp. 21-5302(a).

The jury instruction for possession of marijuana with intent to distribute provided, in relevant part:

"In Count I, the defendant is charged with the crime of unlawfully possessing marijuana with the intent to distribute *at least 450 grams but less than* 30 *kilograms*. . . .
"To establish this charge, each of the following claims must be proved:
"1. The defendant possessed marijuana with the intent to distribute.
"2. The quantity of the marijuana possessed with the intent to distribute was *at least 450 grams but less than 30 kilograms*.
"3. This act occurred on or about the 23rd day of January, 2014, in Geary County, Kansas." (Emphases added.)

The jury instruction for the charge of no drug tax stamp provided, in relevant part:

"In Count II, the defendant is charged with possession of marijuana, without Kansas tax stamps affixed. . . .
"To establish this charge, each of the following claims must be proved:
"1. That the defendant intentionally possessed *more than 28 grams of marijuana* without affixing official Kansas tax stamps or other labels showing that the tax had been paid.
"2. That the defendant did so on or about the 23rd day of January, 2014, in Geary County, Kansas." (Emphasis added.)

27

The jury instruction for possession of marijuana provided, in relevant part:

> "In Count III, the defendant is charged with possession of marijuana. . . .
> "To establish this charge, the State must prove each of the following claims beyond a reasonable doubt:
> "1. That the defendant possessed marijuana.
> "2. This act occurred on or about the 23rd day of January, 2014 in Geary County, Kansas."

*Were Crudo's convictions for possession of marijuana and no drug tax stamp multiplicitous?*

"'[M]ultiplicity is the charging of a single offense in several counts of a complaint or information'" and "'creates the potential for multiple punishments for a single offense, which is prohibited by the Double Jeopardy Clauses of the Fifth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights.'" *State v. George*, 311 Kan. 693, 696-97, 466 P.3d 469 (2020). This court reviews multiplicity challenges using an unlimited standard of review. 311 Kan. at 696.

The framework for determining whether convictions are multiplicitous involves first asking whether the convictions are for the "same offense"—an inquiry that requires this court to "decide whether 'the convictions arise from the same conduct.'" 311 Kan. at 697. In doing so, the "court examines the facts to determine whether the charges arise from 'discrete and separate acts or courses of conduct' or unitary conduct arising from '"the same act or transaction"' or a '"single course of conduct."'" *Dale*, 312 Kan. at 178.

Courts generally consider four factors in determining whether conduct is "unitary" (i.e., the same conduct): (1) whether the acts occurred at or near the same time; (2) whether the acts occurred at the same location; (3) whether there is a causal relationship

28

between the acts or an intervening event; and (4) whether a fresh impulse motivated some of the conduct. *Dale*, 312 Kan. at 179.

If the court determines the defendant's conduct was unitary, a double jeopardy violation is *possible*. At that point, the court's analysis turns to determining whether there are two offenses or only one. *Dale*, 312 Kan. at 180.

Crudo's argument involves convictions based on two statutes—the statute for possession of marijuana and the statute for no drug tax stamp. Convictions based on different statutes are multiplicitous only if "'the statutes upon which the convictions are based contain an identity of elements.'" *George*, 311 Kan. at 697. To determine whether there is an identity of elements, we ask "'whether each offense requires proof of an element not necessary to prove the other offense.'" 311 Kan. at 698. If each offense requires proof of an element unnecessary to prove the other offense, the convictions are not multiplicitous. See 311 Kan. at 698 (determining that statute for each offense required proof of element that was not required by statute for other offense, and concluding convictions were not multiplicitous).

The Kansas Supreme Court in *Hensley* discussed how this analysis is affected by K.S.A. 21-3107(2)(b)—which is now codified at K.S.A. 2021 Supp. 21-5109(b)(2). *Hensley*, 298 Kan. at 427, 435; see L. 2010, ch. 136, § 307. K.S.A. 2021 Supp. 21-5109(b) is the statute Crudo references in his double jeopardy arguments. The *Hensley* court explained the Kansas and federal double jeopardy clauses "prohibit a court from imposing multiple punishments under different statutes for the same conduct in the same proceeding *when the legislature did not intend multiple punishments.*" (Emphasis added.) 298 Kan. at 435. The court explained the identity of elements test (calling it the "same-elements test") is merely a rule of construction used to determine whether the Legislature intended to punish the same conduct under the two statutes. 298 Kan. at 435-36. Under the test, if each statute contains an element not found in the other, we presume the

Legislature intended punishment for both crimes. 298 Kan. at 435. But the *Hensley* court explained that legislative history can override this presumption and stated: "K.S.A. 21-3107(2)(b) clearly specifies a circumstance in which our legislature did not intend cumulative punishment, removing the need to turn to legislative history." 298 Kan. at 436. The court explained that "K.S.A. 21-3107(2)(b) is essentially the inverse of the same-elements test as it prohibits a defendant from being convicted of both a greater and lesser crime, and defines a lesser crime as 'a crime where all elements of the lesser crime are identical to some of the elements of the crime charged.'" 298 Kan. at 436. The court held that as a result, this statute "supplants the same-elements test" or the identity of elements test. 298 Kan. at 436.

Crudo contends the charges for possession of marijuana and for no drug tax stamp arose from unitary conduct because the drugs were all found at the same time—during the traffic stop. He argues "the fact some were in the camper and some in the pickup should not alter the calculus" and notes he owned both the pickup and the camper. He cites four cases in support of his assertion—*State v. Unruh*, 281 Kan. 520, 133 P.3d 35 (2006); *State v. Alvarez*, 29 Kan. App. 2d 368, 28 P.3d 404 (2001); *State v. Rank*, No. 122,893, 2021 WL 4032859 (Kan. App. 2021) (unpublished opinion); and *State v. Gilmore*, No. 97,362, 2008 WL 5234530 (Kan. App. 2008) (unpublished opinion).

Crudo explains that in *Unruh*, methamphetamine was found in multiple areas within a van, while various items commonly used to manufacture methamphetamine were found in the back of the van. He highlights that the State brought multiple drug charges against Unruh, and when addressing whether a unanimity instruction was warranted, the *Unruh* court found the case involved "multiple items of evidence but not multiple acts." 281 Kan. at 529. Crudo asserts that in *Unruh*, "[t]here were not multiple acts because 'there was no temporal, geographic, or other separation or severance of the acts.'" But these statements from *Unruh* are inapplicable. Although *Unruh* included a double jeopardy analysis, the holdings Crudo references did not come from the double jeopardy

30

analysis but from the court's unanimity instruction analysis for the possession of methamphetamine charge. Thus, the court was determining whether the methamphetamine found in the various locations would be considered multiple acts that could each constitute the *single* crime of possession of methamphetamine. 281 Kan. at 528-29. And in the *Unruh* court's double jeopardy analysis, it never analyzed whether the conduct was unitary, because it determined the convictions were not multiplicitous. *Unruh*, 281 Kan. at 533-34.

Both *Alvarez*, 29 Kan. App. 2d at 369-70, and *Rank*, 2021 WL 4032859, at *2, are inapplicable for the same reasons—they did not involve double jeopardy challenges, but challenges to a district court's failure to give a unanimity instruction when the defendant believed the State presented multiple acts that could prove the charged crime of possession of methamphetamine.

The final case Crudo cites—*Gilmore*, 2008 WL 5234530—is the only one which bears any possible relevance. In that case, the court found Gilmore's convictions for possession of methamphetamine with intent to distribute and simple possession of methamphetamine arose from the same conduct based on the following analysis of the four factors:

> "When we apply these factors to our case, we conclude that the charges did arise from the same conduct. All of the drugs and paraphernalia were seized at nearly the same time in or around the apartment when the search warrant was executed. All of the items were causally related to [the defendant's] alleged participation in the manufacture or acquisition of methamphetamine without any intervening fresh impulse. Although [the defendant] allegedly possessed several different items, the charges all arose from the same conduct: his possession of drugs and paraphernalia." *Gilmore*, 2008 WL 5234530, at *1.

That said, the facts of Crudo's case and *Gilmore*'s are critically different. First, the evidence underlying the drug tax stamp conviction had to be the 19 bags of marijuana found under the bathtub in the camper because the drug tax stamp charge stemmed from a weight of "over 28 grams of marijuana." The jury was also informed of this weight requirement in the jury instruction for the drug tax stamp charge. The only evidence presented at the first trial about the weight of any of the marijuana related to the 19 vacuum-sealed bags of marijuana. Moreover, the only testimony referencing drug tax stamps was Lt. Ricard's testimony that these 19 bags did not have any such stamps.

The evidence underlying the possession of marijuana conviction, on the other hand, could have been the marijuana found underneath the stairs in the camper or the small piece of marijuana found in the pickup. Lt. Ricard and Lt. Stopper only testified that the 19 bags reflected possession with the intent to distribute. But they testified the marijuana found under the stairs in the camper contained items consistent with personal use—a grinder and rolling paper. And Lt. Ricard testified the piece of marijuana found in the pickup was a small "bud"—just after he confirmed that grinders are used to grind up marijuana buds and then those buds are put into rolling paper to form a joint. This would similarly suggest the small piece of marijuana found in the pickup was for personal use.

Turning to the first factor of the unitary conduct analysis, all the marijuana was found around the same time—during the search of the pickup and the camper. See *Dale*, 312 Kan. at 179. That said, as to the second factor, the marijuana was found in three locations—in the pickup, under the bathtub in the camper, and under the stairs in the camper. See 312 Kan. at 179. And there is no evidence of any intervening event, as considered in the third factor. See 312 Kan. at 179. The most significant factor here may be the fourth factor—which asks whether a "fresh impulse" motivated some of the conduct. 312 Kan. at 179. Here, the conduct leading to the no drug tax stamp conviction (the 19 bags) and the conduct leading to the possession of marijuana conviction (the marijuana found underneath the stairs or the small piece of marijuana found in the

32

pickup) would be prompted by separate impulses—the first being an impulse to distribute marijuana to others and the second being an impulse to personally use marijuana. See *State v. Thompson*, 287 Kan. 238, 248, 200 P.3d 22 (2009) (effectively providing examples of both separate and singular impulses by stating: "[O]rdinarily, . . . the possession of heroin would be prompted by a separate impulse from possession of cocaine or possession of methamphetamine. . . . In contrast, a defendant might gather several items listed in K.S.A. 65-7006(a)[—statute making it unlawful for any person to possess any of the listed substances with the intent to use the product to manufacture a controlled substance—]when motivated by a single impulse, *i.e.*, a unitary intent to conduct one manufacturing process."). The State cites *State v. Hekekia*, No. 101,781, 2010 WL 2852581, at *1-3, 5 (Kan. App. 2010) (unpublished opinion), in support of its conclusion.

In *Hekekia*, officers were dispatched to a motel and while there, an officer saw Hekekia push a spoon with white residue under her bed covers. After arresting the defendant, the officers obtained a warrant to search the motel room and found two bags containing "'$20 rocks'" in a nightstand drawer. 2010 WL 2852581, at *1. One bag contained nine rocks and the other contained four. Each rock was individually packaged. The officers testified the size of each rock was a common amount for sale. They also found a larger chunk of crack cocaine in the drawer, a pipe used for smoking crack cocaine on top of the nightstand, and a roll of toilet paper containing a chunk of crack cocaine on top of the television. The amount of crack cocaine found totaled 8.8 grams. During a police interview following the search, the defendant conceded there had been crack on the spoon which she intended to smoke, but she flushed it when the officers came. She denied any knowledge of the cocaine in the drawer. The State charged the defendant with seven counts, including possession of cocaine and possession of cocaine with intent to sell, distribute, or deliver and possession of cocaine. At trial, the defendant admitted to possessing cocaine for personal use, but she denied possessing with the intent to distribute or having any knowledge of the cocaine found in the drawer. The jury found

33

her guilty of both possession of cocaine with intent to sell, distribute, or deliver and possession of cocaine. On appeal, she claimed these two convictions were multiplicitous. The panel turned to the first question in the multiplicity analysis—determining whether the convictions arose from the same conduct (i.e., unitary conduct). The defendant argued all the evidence of cocaine possession stemmed from the same conduct. But the panel found the convictions were not based on the same conduct, relying on the "'fresh impulse' factor":

> "More helpful is the 'fresh impulse' factor. Because the possession here was mostly simultaneous rather than sequential, a 'fresh' impulse may not be relevant, but there are at least different impulses. The large amounts of cocaine were, the evidence suggests, for sale rather than for personal use. The cocaine that was on the spoon and was flushed was obviously not for sale since [the defendant] said she had intended to use it. These were not the same conduct, and her convictions were not multiplicitous." 2010 WL 2852581, at *5.

Similar here, the 19 bags which led to the no drug tax stamp conviction were, as the evidence suggests, for distribution rather than for personal use, while the evidence suggests the marijuana found in the pickup and under the stairs in the camper was for personal use. Thus, we find different impulses motivated the conduct—an impulse to distribute marijuana versus an impulse to personally use it.

We find Crudo's convictions for possession of marijuana and for no drug tax stamp did not arise out of unitary conduct because the evidence was not found in the same location and separate impulses motivated the conduct that led to each conviction. Thus, the convictions are not multiplicitous and Crudo's double jeopardy argument fails. See *Dale*, 312 Kan. at 178.

*Did the conviction for possession of marijuana with intent to distribute at the second trial violate double jeopardy because Crudo had been convicted of possession of marijuana at the first trial?*

We analyze Crudo's second double jeopardy argument—wherein he claims multiple prosecutions for the same offense—the same away we analyzed his first double jeopardy argument. So, again, we must first determine whether the convictions for possession of marijuana and possession with intent to distribute arise from "unitary conduct," because, as explained above, "[d]ouble jeopardy concerns arise only if unitary conduct is at issue." *Dale*, 312 Kan. at 175, 178, 180 (turning to defendant's successive prosecution double jeopardy claim rooted in K.S.A. 21-3107[2][a]—which court noted is now codified at K.S.A. 2019 Supp. 21-5109—only *after* finding conduct was unitary, stating, "[b]ecause [the defendant's] conduct was unitary, a double jeopardy violation is factually possible, and our analysis must continue").

As to this issue, Crudo simply repeats the argument he made regarding his convictions for possession of marijuana and no drug tax stamp. That is, he claims the drugs found constituted a unitary act. Still, just like those convictions, the convictions at issue—possession of marijuana and possession of marijuana with intent to distribute— did not arise out of unitary conduct.

The evidence underlying the possession of marijuana with intent to distribute conviction had to be the 19 bags. Again, this is because the complaint stated this charge was based on a weight of 450 grams to 30 kilograms. The statute for this offense required proving this weight to categorize the offense as a severity level 2 felony as the State did. See K.S.A. 2013 Supp. 21-5705(d)(2)(C). The jury was also informed that proof of this weight was required to establish this charge. The only evidence presented at either trial about the weight of any of the marijuana related to the 19 bags, as a forensic chemist with the Kansas Bureau of Investigation testified the total weight of the 19 bags amounted to 9.34 kilograms (i.e., 9,340 grams) and confirmed this amount would be between 450

grams and 30 kilograms. At the second trial, Lt. Ricard also testified to this weight in pounds. Neither the marijuana found in the pickup, nor the marijuana found under the stairs in the camper could have led to the conviction for possession with intent to distribute because there was no evidence presented of the weight of this marijuana. And both Lt. Ricard and Lt. Stopper testified possession of the 19 bags reflected marijuana with the intent to distribute. As noted when addressing the first two convictions Crudo challenged, the marijuana found in the pickup and the marijuana found under the stairs in the camper could have served as the evidence that led to the possession of marijuana conviction.

Turning to the four factors for determining whether Crudo's convictions for possession of marijuana and possession of marijuana with intent to distribute arose out of unitary conduct, it is again evident based on to location and "fresh impulse" factors that these convictions were not based on unitary conduct. See *Dale*, 312 Kan. at 179. The marijuana was found in three distinct locations—in the pickup, under the bathtub in the camper, and under the stairs in the camper. See 312 Kan. at 179. And the conduct leading to the possession of marijuana with intent to distribute conviction (the 19 bags) was prompted by a different impulse than the conduct leading to the possession of marijuana conviction (either the marijuana found underneath the stairs in the camper, the marijuana found in the pickup, or both). Again, the evidence suggests the 19 bags underlying the conviction for possession of marijuana with intent to distribute was motivated by an impulse to distribute marijuana, while the marijuana found in the pickup and under the stairs in the camper was motivated by an impulse to personally use marijuana. Thus, the convictions were not based on the same conduct. See *Hekekia*, 2010 WL 2852581, at *5. As a result, Crudo's double jeopardy arguments fail again because double jeopardy concerns arise only if unitary conduct is at issue. See *Dale*, 312 Kan. at 178.

We find Crudo's conviction for possession of marijuana with intent to distribute at the second trial after his conviction of possession of marijuana at the first trial did not

violate Crudo's double jeopardy protections because the two convictions did not arise out of unitary conduct.

*We find no trial errors whose cumulative effect require reversal.*

Finally, Crudo argues the cumulative effect of the trial errors prejudiced his right to a fair trial and, as a result, we must reverse his convictions and order a new trial. But the district court's only error was the legally inappropriate jury instruction, which we found was harmless and did not require reversal. A single error that has been found to be nonreversible cannot establish reversible cumulative error. *Ballou*, 310 Kan. at 617.

Affirmed.